**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PHILIP ROGERS, CAROL MARIN, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) Case No. ) |
| Plaintiffs, | ) **DEMAND FOR JURY TRIAL** ) |
| v. | ) ) |
| AMAZON.COM, INC., a Delaware corporation, | ) ) |
| Defendant. | ) ) |

**COMPLAINT**

Plaintiffs, Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Amazon.com, Inc. ("Amazon"), allege as follows:

**NATURE OF THE CASE**

1. Amazon.com, Inc. built a global voice-AI business on the voices of real people. To train the Foundational Voice Models behind Amazon Polly, Amazon Nova Sonic, Alexa+, Audible AI narration, ACX narrator voice replicas, and Amazon's other commercial voice services, now distributed across more than 600 million Alexa devices and the AWS, Audible, and Kindle ecosystems,

1

Amazon ingested hundreds of thousands of hours of human speech and extracted the unique biometric signatures, the voiceprints, of the speakers in those recordings. Among those speakers are some of the most accomplished broadcast journalists, investigative podcasters, audiobook narrators, and voice performers working in the United States today. Plaintiffs' voices are among them.

2.      Plaintiffs are six Illinois residents whose recorded voices are among the most distinguished in their fields. They include Philip Rogers, an Emmy- and Edward R. Murrow Award-winning broadcaster whose four decades of on-air reporting were conducted from Chicago; Carol Marin, a five-decade broadcast journalist, a three-time Peabody winner, and a recipient of the 2025 Order of Lincoln, Illinois's highest civilian honor; Robin Amer, the creator, host, and showrunner of USA Today's *The City* and a three-time duPont-Columbia honoree; Lindsey Dorcus, a SOVAS Voice Arts Award-winning narrator of more than two hundred audiobooks for the major American publishers; Yohance Lacour, whose investigative podcast *You Didn't See Nothin'* won the 2024 Pulitzer Prize for Audio Reporting; and Victoria Nassif, a Lebanese-Palestinian American audiobook narrator and actor whose Arabic-accented narrations of works by Arab and Palestinian American authors have been commercially released by Penguin Random House, Hachette, and Simon & Schuster. None of them was told that their voice was being used to train Amazon's commercial voice AI. None of them was asked. None of them consented.

3.      A voiceprint is a digital fingerprint of the human voice, a mathematical representation of the acoustic features (pitch, timbre, resonance) that arise from a person's distinctive physiology, combined with the speech patterns developed over a lifetime: accent, cadence, articulation. Like a fingerprint, a voiceprint identifies the individual and cannot be changed. A Social Security number can be reissued. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice — the biological and behavioral patterns that produced the voiceprint are the same ones used to speak every day.

4.      The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 et seq. ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, along with a written release. 740 ILCS 14/15(b). Amazon failed to comply with any of those requirements with respect to Plaintiffs.

5.      Amazon's noncompliance was not the result of misreading BIPA or unfamiliarity with its application to voice processing. Amazon's product documentation for Amazon Connect Voice ID and Amazon Chime SDK speaker search uses the BIPA statutory term "voiceprint," and the phrase "biometric identifiers and biometric information," to describe what its voice-processing systems extract. Amazon's AWS Biometric Notice and Consent Terms expressly

identify BIPA by name and require AWS customers to comply with BIPA when using covered AWS biometric services. Amazon has been a defendant in BIPA litigation in this District concerning its voice products since 2019; a class of approximately 1.2 million Illinois Alexa Voice ID users was certified against Amazon in November 2025 in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.). In May 2023, the FTC and DOJ obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon for retaining children's Alexa voice recordings, recordings the FTC characterized as providing Amazon "with a valuable database for training the Alexa algorithm." Amazon was on notice.

6.      Modern AI voice synthesis works by training neural networks on recorded human speech, learning the acoustic features that make individual voices distinctive, and encoding those features as mathematical representations within the model's parameters. The same parameters are then used to generate new speech that exhibits the acoustic features of the training voices. The speaker-conditioned representations extracted during training are not separately stored in a database that can be deleted on request; they are encoded in the model parameters themselves. When any of the Voice Products produces speech, the synthetic speech is a mathematical reproduction of the biometric characteristics extracted from the speakers whose recordings trained the model. The product is the data; the data is the product.

7.      Amazon's noncompliance was not a failure of safety capability. Amazon has the engineering and legal sophistication to build BIPA-compliant

4

consent workflows when it chooses to, and has done so for every voice category it collects with the data subject's participation, as alleged at ¶¶ 117-122. Amazon built none of that infrastructure for the voiceprints it took to train the Foundational Voice Models on which those very products depend.

8. Amazon's noncompliance was, instead, a deliberate institutional decision. Amazon's training corpora measure in the tens and hundreds of thousands of hours: BASE TTS alone was "trained on 100K hours of public domain speech data"; Amazon Polly's generative engine was "trained with publicly available and proprietary data"; Amazon Nova Sonic and Nova 2 Sonic were trained on "licensed, proprietary, open-source, and publicly available" data. BIPA-compliant collection would have required Amazon to identify the source speakers, provide written notice of the specific purpose and duration of collection, and obtain a written release from each speaker before ingesting that speaker's recording. With corpora at this scale, comprising the recordings of hundreds of thousands of distinct speakers, BIPA compliance would have constrained the speed and scale of Amazon's voice-AI development. Amazon chose speed and scale over compliance. That was not an oversight. It was a business decision.

9. For audiobook narrators, Amazon's choice is particularly stark. Audible is the dominant commercial distributor of audiobook narration in the United States. Plaintiffs Lindsey Dorcus and Victoria Nassif distribute their human narrations through Audible, which already directly possesses and controls copies of their recordings. Amazon's commercial path from voice

ingestion to voice product is, for the audiobook market, a closed loop: Amazon distributes the human narrations through Audible, ingests them as training data for the Foundational Voice Models, and sells AI narration — through Audible AI narration, ACX narrator voice replicas, and Kindle Direct Publishing Virtual Voice — back through Audible, Kindle, and Amazon Music. The product Amazon competes against the narrators with is built from the narrators' own voices.

10. The voiceprints Amazon extracted from Plaintiffs have been disseminated across Amazon's cross-affiliate ecosystem (Audible, ACX, AWS, Amazon Music, IVONA, and others), across Amazon's global cloud-infrastructure subprocessor and vendor network, and across Amazon's named integration partners for Amazon Nova 2 Sonic, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat. They cannot be recovered or replaced.

11. Plaintiffs' injuries are concrete and particularized. Amazon extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. Amazon retains those voiceprints in its commercial models and continues to profit from them. Amazon has further disseminated those voiceprints, encoded in model parameters, through its cross-affiliate, subprocessor, and integration-partner networks. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living — the broadcast journalism, investigative podcast, audiobook narration,

voiceover, and voice performance markets that the Voice Products are designed and sold to serve.

12.     Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that Amazon unlawfully collected, retained, commercialized, and disseminated their voiceprints, failed to protect them from disclosure, and did so without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that Amazon's commercial use of their voices and identities to build and sell AI products that mimic them violates the Illinois Right of Publicity Act ("IRPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13.     Plaintiffs seek (i) statutory damages under 740 ILCS 14/20 for Amazon's BIPA violations, on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026); (ii) actual damages and disgorgement of the profits Amazon has earned from the commercial exploitation of Plaintiffs' biometric data; (iii) injunctive relief requiring Amazon, among other things, to cease unconsented collection of voiceprints from Illinois-recorded voice work, to identify the sources of its voice training data, to destroy the voiceprints unlawfully obtained from Plaintiffs and the Class, and to destroy or retrain the Foundational Voice Models in which those voiceprints are encoded and the

Voice Products built on those models; and (iv) reasonable attorneys' fees, costs, and expenses.

## PARTIES

14. Plaintiff Philip Rogers ("Rogers") is a citizen of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), and was recognized with a National Emmy Award and the Edward R. Murrow Award. Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Amazon extracted his voiceprint are described at ¶¶ 88-91 and 92-94.

15. Plaintiff Carol Marin ("Marin") is a citizen of Illinois and resides in this District. Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago and was recognized in 2025 with the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 95-97.

16. Plaintiff Robin Amer ("Amer") is a citizen of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator, host, and showrunner of USA Today's *The City* and as Managing Editor of *Love + Radio*, and who has been recognized as a three-time Alfred I. duPont–Columbia University Award winner or finalist. Amer's body of

professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 98-100.

17. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of Illinois and resides in this District. Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for major American publishers from her home recording studio in Chicago, and is a Society of Voice Arts and Sciences Voice Arts Award winner. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 101-103.

18. Plaintiff Yohance Lacour ("Lacour") is a citizen of Illinois and resides in this District. Lacour is a journalist and audio storyteller from the South Side of Chicago whose investigative podcast *You Didn't See Nothin'*, produced through the Invisible Institute and USG Audio, was awarded the 2024 Pulitzer Prize for Audio Reporting. Lacour's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that Amazon extracted his voiceprint are described at ¶¶ 88-91 and 104-106.

19. Plaintiff Victoria Nassif ("Nassif") is a citizen of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work has been commercially released by Penguin Random House, Hachette, and Simon & Schuster and produced primarily in Illinois.

9

Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that Amazon extracted her voiceprint are described at ¶¶ 88-91 and 107-109.

20.     Defendant Amazon.com, Inc. ("Amazon") is a Delaware corporation with its principal executive offices at 410 Terry Avenue North, Seattle, Washington 98109-5210.

21.     Amazon.com, Inc. is the parent enterprise that owns, operates, controls, and consolidates the financial results of the business units through which the voice synthesis and voice cloning conduct alleged in this Complaint was and continues to be carried out. Those business units include: Amazon Web Services, Inc. ("AWS"), which operates Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Bedrock (the platform on which Amazon Nova Sonic and Amazon Nova 2 Sonic are hosted), Amazon Connect Voice ID, and Amazon Chime SDK voice analytics and speaker search; Amazon's Devices & Services organization, which develops and deploys Alexa, Alexa+, and Alexa Voice ID across Echo and Alexa-enabled devices; Audible, Inc., a wholly owned Amazon subsidiary that operates the Audible audiobook distribution platform and the Audible AI narration program; Audiobook Creation Exchange ("ACX"), Audible's wholly owned audiobook production marketplace, which operates the ACX narrator voice replicas beta; Amazon Music, an Amazon-owned music and audio streaming platform; Kindle Direct Publishing, the Amazon self-publishing channel that operates the KDP audiobooks-with-Virtual-Voice program ("KDP Virtual Voice"); Amazon Science

10

and Amazon AGI, which conducted the BASE TTS research alleged in this Complaint; and IVONA Software sp. z o.o., the Polish text-to-speech technology company Amazon acquired in January 2013 and through which Amazon entered the text-to-speech business.

22. The voice synthesis and voice cloning services Amazon markets and sells to consumers, developers, and enterprise customers through the above business units — Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Nova Sonic, Amazon Nova 2 Sonic, Audible AI narration, ACX narrator voice replicas, Kindle Direct Publishing Virtual Voice, Alexa text-to-speech, and Alexa+ — are referred to collectively in this Complaint as the "Voice Products". The underlying voice synthesis and voice cloning models in which Plaintiffs' and Class members' voiceprints are encoded, including the BASE TTS model and the base models on which each of the Voice Products depends, are referred to collectively as the "Foundational Voice Models".

23. Amazon.com, Inc.'s direct involvement in the voice synthesis and voice cloning conduct at issue is established by Amazon's public disclosures. Amazon's Form 10-K filings identify Amazon Web Services, the Alexa and Devices & Services business, Audible, and the broader Amazon AI and voice-AI capabilities as material components of Amazon's consolidated business. Amazon's Chief Executive Officer, Andy Jassy, has personally identified generative AI, including Amazon's voice-AI capabilities, as a strategic priority of Amazon.com, Inc. in successive shareholder letters, in quarterly earnings calls

11

accompanying Amazon's Form 10-Q and 10-K filings, and in keynote presentations at AWS re:Invent.

24. Amazon's enterprise-level documents governing the voice business, including the Amazon.com Conditions of Use, the AWS Customer Agreement, the AWS Service Terms, the AWS Biometric Notice and Consent Terms, and the AWS Responsible AI Policy, are issued at the Amazon.com, Inc. or AWS level under Amazon.com, Inc.'s control.

25. The voice training, model development, deployment, dissemination, and ongoing commercial operation alleged in this Complaint were carried out by personnel under Amazon.com, Inc.'s direct corporate control, on infrastructure that Amazon.com, Inc. and its wholly owned subsidiaries own and operate, in the ordinary course of Amazon's business.

## JURISDICTION AND VENUE

26. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). (a) The proposed Class includes more than 100 members. (b) The aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. (c) Minimal diversity is satisfied because Plaintiffs are citizens of Illinois, and Defendant Amazon.com, Inc. is a citizen of Delaware (where it is incorporated) and Washington (where it maintains its principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

27. The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of

12

liquidated damages or actual damages — $1,000 for a negligent violation or $5,000 for an intentional or reckless violation — and Plaintiffs may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment. On information and belief, Amazon extracted voiceprints and biometric information from voice recordings of hundreds of thousands of individuals whose recordings were produced or recorded in Illinois. The aggregate damages across the proposed Class, together with the injunctive, equitable, and other relief sought, far exceed CAFA's $5,000,000 threshold.

28. This Court has specific personal jurisdiction over Amazon. Amazon has purposefully directed its conduct at Illinois and this District in ways that bear directly on Plaintiffs' claims, and Plaintiffs' claims arise out of or relate to those Illinois-directed contacts. Exercising jurisdiction is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Amazon's Illinois- and District-related contacts include, without limitation:

29. *Illinois market exploitation.* Amazon makes its commercial voice synthesis and voice cloning products — including the Voice Products — available to users nationwide, including Illinois residents and Illinois-based

13

businesses, through its websites (aws.amazon.com, amazon.com, audible.com, kdp.amazon.com, blog.acx.com), the AWS Management Console, Amazon Bedrock, Alexa devices and the Alexa app, the Audible app, the Kindle ecosystem, and Amazon mobile applications on iOS and Android. Amazon does not geoblock Illinois users from its voice products and affirmatively invites and enables Illinois residents to use them.

30. *Illinois transactional contacts.* Amazon enters into recurring contractual relationships with Illinois residents and Illinois-based businesses through its Amazon.com Conditions of Use, AWS Customer Agreement, AWS Service Terms, Audible Conditions of Use, Alexa Terms of Use, KDP Terms and Conditions, ACX Terms of Service, AWS Biometric Notice and Consent Terms, and AWS Responsible AI Policy. Amazon offers and operates tiered subscription plans, consumption-based pricing, and enterprise commitments for AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible subscriptions, Amazon Music subscriptions, Alexa+ subscriptions, and Amazon retail commerce — accepting and processing recurring subscription payments, consumption charges, and retail purchases from Illinois users on an ongoing basis. Each Audible monthly credit, each Amazon Music subscription renewal, each Alexa+ subscription, each AWS consumption-billed API call, and each Amazon retail purchase from an Illinois customer is a new commercial transaction with an Illinois customer.

31. *Illinois operational presence.* Amazon maintains office locations and significant operational presence in Illinois, including in the City of Chicago.

14

Amazon owns and operates fulfillment centers, sortation centers, delivery stations, Whole Foods Market locations, and Amazon Fresh stores throughout Illinois. Amazon markets and sells AWS cloud services, including Amazon Polly, Amazon Bedrock, and Amazon Connect voice products, to Fortune 500 companies and other enterprises headquartered in Illinois, and to state and local government, healthcare, financial services, and education customers in Illinois. Amazon owns and operates global cloud infrastructure (AWS), including a content delivery network and edge infrastructure (Amazon CloudFront), that routes user traffic originating in Illinois through edge servers and data center facilities owned, operated, and configured by Amazon, including infrastructure located in or near Chicago. On information and belief, Amazon derives substantial revenue from enterprise subscriptions, retail commerce, and commercial use by entities operating in Illinois.

32.     *Illinois-targeted service delivery.* Amazon's Alexa, Alexa+, Audible, Amazon Music, Kindle, and Amazon Polly platforms receive requests — voice utterances, audio streams, text prompts, transcription requests — transmitted from user devices located in Illinois to Amazon-controlled endpoints, and transmit AI-generated voice outputs and processed audio from those endpoints back to devices located in Illinois. This constitutes repeated, interactive service performance directed at and delivered into Illinois. Amazon's terms grant Amazon contractual rights to use voice and speech data submitted by Illinois users in connection with Alexa, Amazon Connect Voice ID, Amazon Chime SDK, Amazon Polly, and other Amazon voice products; once captured from its

15

Illinois customers, voiceprints, voice profiles, voice embeddings, and related biometric processing outputs are used by Amazon to operate and improve its products.

33. *Amazon's Illinois-origin biometric extraction.* Amazon directly collected, captured, and obtained biometric identifiers — voiceprints — from voice recordings produced or recorded in Illinois, including the recordings of Plaintiffs, without the notice, consent, or written release that BIPA requires. Amazon itself, through systems it operates and controls, accessed Plaintiffs' publicly available voice recordings on third-party platforms (including YouTube, Spotify, Apple Podcasts, iHeartRadio, SoundCloud, and others) and ingested those recordings into its training pipeline. With respect to Plaintiffs whose recordings are distributed through Audible, Amazon Music, and ACX, Amazon-owned subsidiaries, Amazon already directly possessed and controlled the recordings as a matter of corporate ownership and did not need to scrape them from third-party platforms to access them. Amazon's acquisition of Plaintiffs' voice recordings was not the passive receipt of an anonymized dataset assembled by a third party; Amazon itself accessed identifiable speakers on identified platforms displaying the speakers' names, geographic locations, professional biographies, and content catalogs. The biometric identifiers belong to persons whose recordings were produced or recorded in Illinois. The privacy interests invaded are those of Illinois-recorded speakers. Amazon's act of extracting voiceprints from Illinois-recorded voice recordings is

16

conduct directed at Illinois regardless of the physical location of the servers on which the extraction occurred.

34.    *Continuing wrong directed at Illinois.* Amazon's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued commercial use of those voiceprints to power products sold and delivered to Illinois users, constitutes a continuing wrong directed at Illinois-recorded speakers and felt in Illinois. BIPA § 15(a) imposes ongoing obligations on entities that possess biometric identifiers, including developing and publishing a retention and destruction schedule. Amazon is in possession of voiceprints originating from Illinois-recorded voice recordings and has been since their collection. The persons whose biometric data Amazon holds without compliant safeguards are persons whose voice recordings were produced or recorded in Illinois.

35.    *Illinois commercial use as downstream of Illinois extraction.* The voice products Amazon sells and delivers to Illinois customers are powered by the same Foundational Voice Models that were trained using voiceprints extracted from Illinois-recorded voice recordings, including, on information and belief, recordings of Plaintiffs and Class members. The voice quality, expressiveness, multilingual capability, and speaker similarity that Illinois customers pay for are enabled by the biometric data extracted during training. When an Illinois customer uses any of the Voice Products, the output is generated by a model whose capabilities are derived from voiceprints at issue in this lawsuit. Amazon's Illinois-directed commercial activity is not merely

incidental to Plaintiffs' claims; it is the downstream monetization of the conduct that gives rise to those claims.

36. *Suit-relatedness across the statutes invoked.* Amazon's BIPA violations are suit-related to its Illinois contacts because Amazon's commercialization of its voice products in Illinois, through subscriptions, interactive service performance, and delivery of voice outputs to Illinois users, necessarily involves the ongoing use of voiceprints extracted without BIPA-compliant notice and consent. Amazon's IRPA violations are suit-related because Amazon commercially exploits the voices and identities of Illinois-recorded speakers to develop, market, and sell its voice synthesis products to Illinois users and nationwide, and disseminates voice-simulative outputs to and within Illinois through its subscription and consumption-based services. On information and belief, Amazon further shares voice data, including biometric identifiers derived from training data, with affiliates (Audible, ACX, AWS, Amazon Music, IVONA, and others), with cloud-infrastructure subprocessors, and with named Nova 2 Sonic integration partners (Vonage, Twilio, AudioCodes, LiveKit, and Pipecat), constituting additional suit-related conduct directed at Illinois.

37. Exercising specific personal jurisdiction over Amazon in this District is consistent with the Illinois long-arm statute, 735 ILCS 5/2-209, and with due process. Illinois has a strong and particularized interest in providing a forum for redressing the unlawful collection and commercial exploitation of biometric identifiers of persons whose recordings were produced or recorded in

18

Illinois, an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5. Plaintiffs, as Illinois residents whose recordings were produced in Illinois and whose biometric privacy was invaded in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on Amazon of litigating in Illinois is not undue, given Amazon's substantial Illinois commercial activity, its resources as a publicly traded technology and retail enterprise reporting $716.9 billion in fiscal-year-2025 net sales, and its experience as an active litigant in federal courts across the United States, including as the defendant in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.), a BIPA action concerning Amazon's voice products already pending in this District. Amazon could reasonably anticipate being haled into Illinois courts for claims arising out of its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

38. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiffs' claims occurred here: Plaintiffs are residents of this District; their recorded vocal performances were produced or recorded in this District; the biometric privacy violations Plaintiffs allege occurred in this District; and the commercial exploitation of Plaintiffs' voiceprints continues through Amazon's sale and delivery of the voice AI products at issue to customers in this District. Amazon's deceptive and unfair practices in connection with Amazon's training-data acquisition and voice-data handling were directed at and received by

19

Illinois residents in this District through Amazon's websites, mobile and desktop applications, marketing materials, privacy disclosures, and AWS documentation. Amazon's ongoing possession of Plaintiffs' and Class members' voiceprints, and its continued use of those voiceprints to power products delivered into this District, constitutes a continuing course of conduct giving rise to Plaintiffs' claims in this District.

39.     Venue is independently proper in this District under 28 U.S.C. § 1391(b)(1) because Defendant Amazon resides in this District within the meaning of 28 U.S.C. § 1391(c)(2) and § 1391(d): Amazon's contacts with this District, as alleged at ¶ 28-37, are sufficient to subject it to personal jurisdiction in this District if this District were a separate State.

## **FACTUAL BACKGROUND**

*Amazon's AI Business and Operative Voice Products*

40.     Amazon entered the text-to-speech business in January 2013 through the acquisition of IVONA Software sp. z o.o., a Polish text-to-speech technology company whose technology powered Kindle Fire Text-to-Speech, Voice Guide, and Explore by Touch. The IVONA technology and personnel became the foundation of what would, over the next thirteen years, become one of the largest commercial voice-AI businesses in the world.

41.     Amazon's voice synthesis and voice cloning business is operated across multiple corporate units, all under the ownership and control of Amazon.com, Inc. AWS operates Amazon Polly text-to-speech (with Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice (a fully

managed custom-voice service), Amazon Bedrock (the foundation-model platform that hosts Amazon Nova Sonic and Amazon Nova 2 Sonic), Amazon Connect Voice ID (biometric authentication of contact-center callers), and Amazon Chime SDK voice analytics and speaker search. Amazon's Devices & Services organization develops and deploys Alexa, Alexa+, and Alexa Voice ID across Echo and Alexa-enabled devices. Audible, Inc., an Amazon-owned subsidiary, operates the Audible audiobook distribution platform and the Audible AI narration program. ACX, Audible's wholly owned production marketplace, operates the ACX narrator voice replicas beta. Amazon Music operates an audio streaming platform on which podcast and other audio content is distributed. Kindle Direct Publishing operates the Amazon self-publishing channel and the KDP Virtual Voice program. Amazon Science and Amazon AGI conduct foundational AI research, including the BASE TTS 1-billion-parameter text-to-speech research model.

42. Amazon's commercial voice products span the full range of AI voice technology and have rolled out in a sustained sequence over more than a decade:

(a) Amazon acquired IVONA Software in January 2013, entering the text-to-speech business.

(b) Amazon Echo, the consumer voice assistant device powered by Alexa, was made generally available in June 2015, accompanied by the Alexa Skills Kit and Alexa Voice Service.

21

(c)     Amazon Polly launched as a cloud text-to-speech service with 47 voices in 24 languages on November 30, 2016.

(d)     Amazon Polly Neural Text-to-Speech and newscaster-style voices launched on July 30, 2019.

(e)     Amazon Polly Brand Voice (fully managed custom-voice capability built on neural TTS) launched on February 4, 2020.

(f)     Amazon Connect Voice ID launched on September 27, 2021.

(g)     Kindle Direct Publishing audiobooks-with-Virtual-Voice beta launched on November 1, 2023.

(h)     Amazon's BASE TTS research paper, describing a 1-billion-parameter Transformer trained on 100,000 hours of public-domain speech, was published in February 2024.

(i)     Amazon Polly's generative engine became generally available on May 8, 2024.

(j)     Alexa+, the next-generation generative-AI Alexa, was announced on February 26, 2025, and became available to all U.S. customers in February 2026 (free for Prime members; $19.99/month for non-Prime customers).

(k)     Amazon Nova Sonic, the first unified speech-to-speech foundation model on Amazon Bedrock, launched on April 8, 2025.

(l)     Audible announced AI narration and translation for publishers (more than 100 AI-generated voices) on May 13, 2025.

(m)     ACX narrator voice replicas beta was publicly described in updated form on July 9, 2025.

22

(n)     Amazon Nova 2 Sonic launched on December 2, 2025, with expressive masculine and feminine voices, polyglot voices, natural turn-taking, and integration with Amazon Connect, Vonage, Twilio, AudioCodes, LiveKit, and Pipecat.

(o)     Amazon Polly bidirectional streaming (real-time speech synthesis for conversational AI) launched on March 26, 2026.

43.     Amazon's scale dwarfs that of typical voice-AI defendants. Amazon reported net sales of $716.9 billion for fiscal year 2025, including $128.7 billion from AWS, and approximately 1,576,000 full-time and part-time employees as of December 31, 2025. In Amazon's February 2025 announcement of Alexa+, Amazon stated that more than 600 million Alexa devices were in use. Audible is the largest audiobook seller and producer in the United States; Amazon Music is a major music and audio streaming platform; Kindle Direct Publishing is the dominant self-publishing channel; AWS distributes Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK to enterprise customers globally. Amazon Polly offers more than 600 neural voices across more than 30 languages and locales.

44.     Amazon's voice products reach Illinois residents and Illinois-based businesses through Amazon's consumer, developer, and enterprise distribution channels, without geographic restriction. The products operate under tiered pricing ranging from free trials and developer-tier consumption pricing to enterprise commitments, with paid customers receiving commercial use rights to generated audio. Amazon offers tiered subscriptions, consumption-based

pricing, and enterprise commitments for AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible memberships, Amazon Music subscriptions, Alexa+ subscriptions (free for Prime members; $19.99/month otherwise), KDP author distribution, ACX royalty-share or per-finished-hour narrator compensation, and Audible publisher partnerships.

*Voice Synthesis Technology and the Extraction of Voiceprints*

45. Modern AI voice synthesis works by training computational models on large quantities of recorded human speech. During training, the models learn the statistical patterns that define how human voices sound, including the acoustic features that distinguish one speaker from another and the general properties that make speech recognizable as natural human communication. The training process extracts and encodes the distinctive acoustic characteristics of individual speakers from the training recordings.[1]

46. These characteristics, commonly referred to in the AI research community as "speaker embeddings" and, in Amazon's own product documentation, as "voiceprints," "digital voiceprints," "speaker embeddings,"

---

[1] *See* Łajszczak et al., *BASE TTS: Lessons from building a billion-parameter Text-to-Speech model on 100K hours of data*, Amazon AGI / arXiv:2402.08093 (Feb. 2024), https://arxiv.org/abs/2402.08093 (last visited on May 12, 2026) (describing a 1-billion-parameter autoregressive Transformer trained on 100,000 hours of speech, using a speech tokenizer with speaker ID disentanglement and a separate speaker embedding at synthesis to produce speaker-faithful output); Amazon Web Services, *Use real-time caller authentication with Voice ID*, Amazon Connect Administrator Guide, https://docs.aws.amazon.com/connect/latest/adminguide/voice-id.html (last visited on May 12, 2026) (describing voiceprints as mathematical representations of speaker-specific acoustic features); Amazon Web Services, *UpdateVoiceProfile*, Amazon Chime SDK API Reference, https://docs.aws.amazon.com/chime-sdk/latest/APIReference/API_voice-chime_UpdateVoiceProfile.html (last visited on May 12, 2026) (describing voice processing as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint").

"speechcodes," and "voice profiles," include features such as timbre, pitch, resonance, cadence, articulation, phrasing, dynamics, and emotional expression. A speaker embedding is a mathematical representation that captures the biologically and behaviorally unique features of an individual's voice. In both function and substance, it is a voiceprint and biometric information derived from a voice recording within the meaning of BIPA.

47. BIPA defines "biometric identifier" to include a "voiceprint." 740 ILCS 14/10. BIPA separately defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." *Id.* Whether the representations Amazon extracts during voice-model training are classified as voiceprints, biometric information derived from voiceprints, or both, they fall within BIPA's scope. The label the technology industry uses for these representations does not determine the statutory classification; the function of the data does.

48. Amazon's product and research documentation confirms the extraction:

(a) AWS's Amazon Connect Voice ID administrator guide describes a "voiceprint", using the BIPA statutory term, as "a mathematical representation that implicitly captures unique aspects of an individual's voice," and states that Voice ID stores "audio files of the speaker's voice, voiceprints, and speaker identifiers."

25

(b)     AWS's Amazon Chime SDK API reference describes the speaker-search system as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint", using both the "biometric identifiers" and "biometric information" terminology that BIPA itself uses.

(c)     Amazon's BASE TTS research paper describes a 1-billion-parameter Transformer that maps text to discrete "speechcodes" and demonstrates one-shot voice cloning from a 10-second reference recording, a capability that requires the extraction and encoding of speaker-specific acoustic characteristics from training audio.

(d)     Amazon's AWS Biometric Notice and Consent Terms, last updated November 14, 2024, expressly identify BIPA, the Texas Capture or Use of Biometric Identifier Act, and the Washington biometric privacy statute by name, and require AWS customers using "Covered AWS Services" — including Amazon Connect Voice ID and Amazon Chime SDK speaker search, to comply with those laws and to obtain "informed written or explicit consent" from data subjects.

49.     On information and belief, the same category of biometric processing that occurs in Amazon's customer-facing voice features, every one of the Voice Products, also occurs during base-model training. The customer-facing features are applications of capabilities built during training. The training pipeline is where extraction of voiceprints and biometric information occurs first, at the largest scale, and on the broadest set of voice recordings — including, on information and belief, the recordings of Plaintiffs and Class

26

members. The voiceprints extracted during training are encoded in the model parameters that produce the synthetic output, and every product Amazon sells through Polly, Nova Sonic, Nova 2 Sonic, Audible AI narration, ACX replicas, KDP Virtual Voice, Alexa+, and the Polly Brand Voice service depends on those parameters.

*Amazon's Training-Data Acquisition Practices*

50. Amazon has never disclosed the complete sources, scale, or provenance of the voice data used to train its commercial voice synthesis and voice cloning models. Amazon has not published a model card, data sheet, training-data manifest, licensing inventory, or transparency report that identifies the voice recordings used to train the Foundational Voice Models, including where Amazon obtained the recordings, the licensing or consent terms applicable to each, or the identities of the source speakers.

51. What Amazon has disclosed for its research and commercial models is partial and self-incriminating:

(a) Amazon's 2024 BASE TTS research paper publicly states that the model was "trained on 100,000 hours of public-domain speech data."

(b) Amazon's May 8, 2024 AWS News Blog post announcing Amazon Polly's generative engine states that the engine was "trained with publicly available and proprietary data" with a variety of voices, languages, and styles, and identifies BASE TTS as the underlying technology powering the generative engine.

27

(c) Amazon's AWS AI Service Cards for Amazon Nova Sonic and Amazon Nova 2 Sonic describe the training and improvement data as "licensed, proprietary, open-source, and publicly available."

(d) Technology press reporting characterized the BASE TTS training corpus as audio "scraped from the web."

52. These disclosures confirm that Amazon, in both research and commercial contexts, has ingested voice recordings of identifiable individuals at industrial scale by direct acquisition and by sourcing from publicly accessible audio platforms, without disclosing source-by-source provenance and without obtaining BIPA-compliant consent from the speakers.

53. On information and belief, Amazon sourced voice recordings for its training pipeline by accessing specific, identifiable audio content created by specific, identifiable speakers on publicly accessible platforms, including YouTube; podcast directories such as Apple Podcasts, Spotify, and iHeartRadio; audiobook platforms such as Audible (an Amazon-owned subsidiary) and LibriVox; music and audio streaming services including Amazon Music (an Amazon-owned platform) and SoundCloud; and broadcast and digital news archives.

54. Amazon's data acquisition was not limited to obtaining pre-packaged, anonymized datasets assembled by third parties. Amazon affirmatively accessed recordings attributable to individual speakers, with metadata identifying the speaker and the geographic origin of the content, on

28

platforms where the speaker's identity, location, and body of work were publicly associated with the recordings.

55. With respect to recordings distributed through Audible, ACX, and Amazon Music, Amazon's subsidiaries already possessed those recordings as a matter of corporate ownership. They did not need to scrape them from third-party platforms to access them.

56. Audible is the largest commercial distributor of audiobook narration in the United States, and the audiobook narrators whose recordings Audible distributes, including Plaintiffs Dorcus and Nassif, are the precise category of voice talent whose work is uniquely valuable for training audiobook-narration voice synthesis.

57. Amazon Music is a major distributor of podcasts and other audio content, and the podcast creators whose recordings it distributes, including Plaintiffs Amer and Lacour, are the precise category of voice talent whose work is uniquely valuable for training long-form narrative podcast voice synthesis.

58. Amazon has been a defendant in BIPA litigation in this District over its voice products since 2019. In *Wilcosky v. Amazon.com, Inc.,* No. 1:19-cv-05061 (N.D. Ill.), Judge Valderrama certified a class on November 6, 2025, of approximately 1.2 million Illinois residents for whom Amazon created an Alexa Voice ID voiceprint. Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings involving Alexa, AWS cloud services, and Amazon Connect.

59.     Amazon's training-data acquisition practices are further documented by federal enforcement action. In May and July 2023, the Federal Trade Commission and the United States Department of Justice obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon under the Children's Online Privacy Protection Act based on allegations that Amazon retained children's Alexa voice recordings indefinitely. The FTC characterized Amazon's retention of voice recordings in its public announcement as providing Amazon "with a valuable database for training the Alexa algorithm." Amazon entered the stipulated permanent injunction without disputing the characterization.

60.     No publicly documented mechanism exists for third parties, individuals whose voices may appear in Amazon's training data without their knowledge, to discover that fact, withdraw consent, or request deletion. Amazon's general Privacy Notice provides certain rights to persons with an existing relationship with Amazon, but it does not address voice data used in the training of Foundational Voice Models and does not apply to non-users like Plaintiffs.

61.     On information and belief, the Foundational Voice Models were trained on voice recordings obtained without the knowledge or consent of the speakers, including voice recordings of Plaintiffs and Class members. This belief is based on Amazon's public disclosures concerning the scale and sources of training data; the FTC and DOJ settlement; Amazon's refusal to disclose source-by-source provenance; the conspicuous absence of any

licensing or consent claim for Amazon's Foundational Voice Models in contrast to the consent infrastructure Amazon built for Voice ID, Polly Brand Voice, ACX replicas, and Audible AI narration; the scale of training data required to build models supporting Amazon Polly's 600+ neural voices, BASE TTS's 100,000 hours, and Nova Sonic's polyglot expressive speech generation; the public availability of Plaintiffs' voice recordings on platforms from which Amazon likely sourced training data (including Audible, Amazon Music, YouTube, Spotify, Apple Podcasts, iHeartRadio, and broadcast archives); and the absence of any mechanism for non-users to discover whether their voices were used or to opt out.

*The Biometric Data Was Generated in Illinois*

62. The conduct giving rise to Plaintiffs' claims is localized in Illinois in three independent and mutually reinforcing respects: (i) the biometric data at issue was generated in Illinois; (ii) Amazon's acquisition of that biometric data targeted material that was identifiably Illinois-origin; and (iii) Amazon's ongoing retention, dissemination, and commercial exploitation of the biometric data is directed at, or felt in, Illinois. Each ground independently supports the application of BIPA, IRPA, and the other Illinois statutes invoked in this Complaint to Amazon's conduct as to Plaintiffs and the Class.

*The Biometric Source Material Was Generated in Illinois*

63. Plaintiffs' voices, the biological characteristics from which voiceprints and biometric information are derived, were produced by Plaintiffs while they were physically present in Illinois. The voice itself, as a unique

31

biometric signature, came into existence in Illinois. The audio recordings embodying Plaintiffs' voices, from which Amazon is alleged to have extracted voiceprints, were created in Illinois while Plaintiffs were physically present in Illinois at the time of recording. The recordings were published from Illinois to publicly accessible platforms, on which Plaintiffs' identity, geographic origin, professional biography, and content catalog were and are publicly visible.

64. The biometric source material — the voice itself, the audio encoding of the voice, and the publicly distributed recordings embodying both — is of Illinois origin. The biometric data Amazon is alleged to have extracted from those recordings is Illinois-origin regardless of where any subsequent processing occurred.

*Amazon's Acquisition Targeted*
*Identifiably Illinois-Origin Material*

65. Amazon accessed Plaintiffs' voice recordings from publicly accessible platforms on which the recordings were hosted with metadata identifying each Plaintiff by name and identifying the recordings' production origin. To a person with knowledge of Illinois broadcast, journalism, audiobook, podcast, and voice-performance markets, the metadata accompanying Plaintiffs' recordings identified each Plaintiff as a speaker whose work originated from Illinois.

66. With respect to recordings distributed through Audible, ACX, and Amazon Music, Amazon-owned subsidiaries, Amazon already directly possessed and controlled the recordings, as it was the corporate owner of those subsidiaries, with complete internal metadata identifying the speakers and

their Illinois production location. Amazon's act of accessing and processing Plaintiffs' recordings was not the passive receipt of an anonymized dataset assembled by a third party; it was the affirmative acquisition of identifiable, attributed voice content — voice content that, at the time of acquisition, was publicly associated with Illinois-based speakers and Illinois-origin production. The Illinois affiliation of each Plaintiff and of each Plaintiff's recordings was knowable from publicly visible information at the time Amazon accessed and processed the recordings.

*Amazon's Ongoing Exploitation Is Illinois-Directed*

67.     Amazon's commercial exploitation of voiceprints and biometric information generated in Illinois is itself Illinois-directed. Amazon sells subscriptions, consumption-based API access, retail audiobooks, music streaming, and AI-generated voice outputs to Illinois subscribers and Illinois-based commercial users on a continuing basis through AWS (including Amazon Polly, Amazon Bedrock, Amazon Connect, and Amazon Chime SDK), Audible, Amazon Music, Kindle Direct Publishing, ACX, Alexa+, and Echo and Alexa-enabled devices. The commercial value of those subscriptions, services, and outputs derives, on information and belief, from voice models developed through unconsented extraction of biometric data, including biometric data generated in Illinois. Each Illinois transaction in those products is the exercise of commercial value Amazon derived from the same biometric extraction Plaintiffs allege is unlawful. Amazon's continuing dissemination of Foundational Voice Models to its affiliates, subprocessors, and named

integration partners, described at ¶¶ 74-79, likewise extends the biometric exploitation outward from the Illinois-recorded source material into Amazon's broader commercial ecosystem.

68. The injury suffered by Plaintiffs and the Class is felt in Illinois. The privacy interest BIPA protects, the right to control the collection, retention, and commercial use of one's biometric identity, is exercised by Plaintiffs in Illinois. Plaintiffs' loss of control over their biometric data, their loss of the licensing and consent rights BIPA preserves, and the dilution of the commercial value of their voices in markets in which they participate are injuries Plaintiffs sustain in connection with their personal and professional activities, including activities in Illinois.

69. BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e) — each of which protects the persons from whom biometric data is taken.

70. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois. Amazon's continuing possession of voiceprints and

34

biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data, including Amazon's failure to publish a § 15(a)-compliant retention schedule and destruction policy covering biometric data obtained from non-user training-data sources, and Amazon's failure to provide any mechanism by which Plaintiffs or any other non-user training-data subject may seek removal or destruction of their biometric data.

*Amazon's Monetization of the Voice Models*
*Through an Integrated Commercial Chain*

71. Amazon's commercial exploitation of its Foundational Voice Models is not limited to a single product line. Amazon monetizes the voice models through a vertically integrated commercial chain spanning AWS enterprise subscriptions, cloud-hosted inference fees, consumer subscriptions and device revenue, audiobook revenue, music streaming revenue, and the broader strategic value of voice AI as part of Amazon's consolidated business. The voice characteristics learned during training, the characteristics extracted from voice recordings, including, on information and belief, the recordings of Plaintiffs and Class members, enable each of these revenue streams.

72. Amazon monetizes the voice models through, at minimum, the following commercial channels:

(a) *AWS enterprise subscriptions and consumption pricing.* AWS charges enterprise customers recurring subscription fees and consumption-based fees for Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Bedrock (hosting Amazon Nova

Sonic and Amazon Nova 2 Sonic), Amazon Connect Voice ID, and Amazon Chime SDK. Each enterprise deployment generates recurring revenue Amazon captures because the voice models exist.

(b)     *Consumer subscription and device revenue.* Amazon charges consumer subscriptions for Alexa+ ($19.99/month for non-Prime customers; free for Prime members), Audible, and Amazon Music, and sells Echo and Alexa-enabled devices that deploy Amazon's voice models. The voice quality and expressiveness of these consumer-facing products derive from the underlying voice models.

(c)     *Audiobook revenue.* Amazon, through Audible, ACX, and Kindle Direct Publishing, generates audiobook revenue from Audible AI narration, ACX narrator voice replicas, and KDP Virtual Voice. Each AI-narrated audiobook sold or streamed is a unit of revenue Amazon captures because the Foundational Voice Models generate the synthetic narration.

(d)     *Amazon Music revenue.* Amazon Music distributes podcast and other audio content, including AI-generated voice content; on information and belief, Amazon's voice model development supports the commercial value of Amazon Music's audio offerings.

(e)     *Strategic and demonstration value for AWS enterprise customer acquisition.* Amazon's commercial value as a cloud-services company depends materially on its ability to demonstrate state-of-the-art AI capability. The Amazon Polly, Nova Sonic, Nova 2 Sonic, and Polly Brand Voice services serve this purpose: by demonstrating that AWS produces commercially capable voice

36

synthesis, Amazon supports the demand for AWS subscriptions, Bedrock platform use, and enterprise commitments that constitute a substantial portion of Amazon's $128.7 billion AWS segment revenue.

(f)     *Broader strategic value of voice AI across Amazon's commercial portfolio.* Amazon deploys voice synthesis capability across its broader product portfolio, including in Alexa+ generative voice interactions across more than 600 million Alexa devices, in customer-facing demonstrations, in industry conferences such as AWS re:Invent, and in partnership integrations. The competitive and strategic value of voice AI deployment across Amazon's product portfolio is itself a benefit Amazon captures from the Foundational Voice Models.

73.     Each monetization channel depends on the Foundational Voice Models. Each Foundational Voice Model depends on the training data used to build it. And the training data, on information and belief, includes the voice recordings of Plaintiffs and Class members from which Amazon extracted voiceprints without notice or consent. The commercial exploitation Amazon captures across the full chain is, in operational substance, the monetization of biometric data Amazon obtained from Plaintiffs without authorization.

*Dissemination Across Amazon's Corporate, Cloud,
and Integration-Partner Infrastructure*

74.     The voice synthesis and voice cloning models in which Plaintiffs' and Class members' voiceprints are encoded are not stored in a single location or accessed by a single legal entity. They are deployed, served, transferred, and

37

disseminated across multiple categories of infrastructure Amazon operates in the ordinary course of its voice-AI business.

75. Amazon conducts its global voice business through a corporate structure that includes Amazon Web Services, Inc., Amazon.com Services LLC, Audible, Inc., Audiobook Creation Exchange (ACX), Amazon Music, IVONA Software sp. z o.o., and other Amazon affiliates. The development, training, refinement, and commercial deployment of Amazon's voice models requires the transfer of those models — and the voiceprints encoded within them — among Amazon's affiliated entities in the ordinary course of business. Audible's AI narration program runs on AWS-hosted foundational voice infrastructure. ACX's narrator voice replicas operate on the same Foundational Voice Models. Amazon Music's audio infrastructure connects to AWS cloud services. Each cross-affiliate use of the Foundational Voice Models involves the transmission of model parameters and inference outputs across Amazon's affiliated entities.

76. Amazon's voice synthesis pipeline operates within a subprocessor framework involving cloud-infrastructure providers, content-delivery-network operators, hardware partners, and other vendors. The pipeline's training, evaluation, deployment, and operation involve, on information and belief, the transmission of model parameters and the voiceprints encoded within those parameters among Amazon's vendors and service providers in the ordinary course of business. The delivery of voice synthesis services to enterprise customers, including Illinois customers, necessarily involves transmitting model parameters and inference outputs over that infrastructure.

77. In Amazon's December 2, 2025 announcement of Amazon Nova 2 Sonic, AWS publicly identified integration partners through which Nova 2 Sonic is deployed, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat, in addition to integration with Amazon Connect. Each of these integration-partner relationships involves Amazon's commercial deployment of the Nova 2 Sonic model, and the voiceprints encoded within it, into the operations of a named third-party service provider for use in customer-facing voice applications.

78. Amazon protects its own confidential and sensitive information under closed-system controls that are materially more protective than the dissemination practices applied to the voiceprints Amazon extracted from non-user training audio. Amazon protects the source code of its commercial products, its proprietary AWS infrastructure designs, its internal financial records, its employee personnel files, its enterprise customer data, and its corporate business communications under access controls, encryption, internal classification systems, and information-security regimes maintained by an information-security organization with global reach. Amazon protects technology subject to United States export controls under additional regulatory protective layers. Amazon protects AWS-customer-uploaded biometric data, including Voice ID enrollment voiceprints, under specific contractual and technical controls, with AWS Key Management Service encryption and customer-managed domain workflows. By contrast, Amazon has not published, and on information and belief does not maintain, any access-control protocol, audit-logging policy, encryption standard, retention schedule, or destruction

39

policy specifically applicable to voiceprints extracted from non-user training audio or to the biometric characteristics encoded in its Foundational Voice Models. Amazon protects what it values. It does not protect what it took without consent.

79.     The pattern of Amazon's dissemination practices places the voiceprints and biometric information of Plaintiffs and Class members in the hands of Amazon's affiliated entities, vendors, subprocessors, service providers, and named integration partners. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception to BIPA's dissemination prohibition under 740 ILCS 14/15(d) applies.

*Commercial Substitution and Economic Harm*

80.     The voice products Amazon built using Plaintiffs' and Class members' biometric data are now sold and deployed into the markets where Plaintiffs and the Class earn their livelihoods. Professional audiobook narration historically has been performed by human narrators at industry rates of approximately $250 to $400 per finished hour, meaning a typical ten-hour novel costs $3,000 to $4,000 to narrate.

81.     The Voice Products generate professional-quality narration at a fraction of those rates and can render an entire audiobook in hours.

82.     Amazon's commercial deployment of voice technology in Audible, ACX, KDP, Amazon Music, Alexa+, Amazon Connect voice deployments, and Amazon Bedrock Nova Sonic conversational AI directly substitutes for human voice professionals in the audiobook narration market.

83.    Audible's May 2025 announcement of speech-to-speech translation that "preserves original narrators' voice and style across languages" demonstrates that Amazon's technology generates digital-replica synthesis on the same audiobook platform on which Plaintiffs Dorcus and Nassif distribute their human narration. For audiobook narrators like Dorcus and Nassif, Amazon distributes the human narrations through Audible, ingests them as training data for the Foundational Voice Models, and then sells AI narration trained on those models back through Audible.

84.    Amazon's voice synthesis products directly substitute for, or threaten to substitute for, long-form investigative audio journalism, podcast hosting and narration, on-air broadcast journalism, and narrative non-fiction audio production — the markets in which Plaintiffs Marin, Rogers, Amer, and Lacour have built their careers and continue to work. The Voice Products generate substitutable voice content in those markets at per-character, per-audio-second, and consumption-based pricing orders of magnitude lower than human-talent rates.

85.    Amazon's voice synthesis products are marketed for studio dubbing, e-learning narration, advertising voiceover, video-game voice acting, and customer-service voice work. Each of these markets has historically been served by professional voice actors, including Plaintiffs Dorcus and Nassif. Amazon's voice synthesis products generate substitutable voice content in those markets at pricing orders of magnitude lower than human voice talent rates.

86.     Amazon's voice synthesis capabilities span more than 30 languages and locales, with polyglot voices in Amazon Nova Sonic and Nova 2 Sonic and the speech-to-speech translation feature in the Audible AI narration program that "preserves original narrators' voice and style across languages." On information and belief, Amazon's multilingual and accented synthesis capabilities include the capability to generate Arabic-accented English narration, Levantine Arabic narration, and other culturally and linguistically specific voice content. This capability competes specifically with the distinctive market position held by Plaintiff Nassif as a Lebanese-Palestinian American audiobook narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors.

87.     Each of Amazon's voice products was built using the vocal characteristics of the human performers it now displaces. The market substitution is therefore not merely temporal but causal. The synthetic audio Amazon generates is generated because the performers' voiceprints were extracted from their recordings and embedded in the model parameters that produce the output.

*Named Plaintiffs*

*Allegations Common to Each Named Plaintiff*

88.     On information and belief, the voice recordings of each named Plaintiff were among the audio that Amazon ingested to train its Foundational Voice Models, and the voiceprints and biometric information derived from those recordings are encoded in the parameters of those models and reproduced in

the audio that those models generate. Each named Plaintiff's catalog of professional voice work matches the profile of training audio that Amazon's technical documentation identifies as optimal — long-form, single-speaker, studio-quality, professionally produced, identifiable by name and source, and continuously available on publicly distributed audio platforms, and corresponds, in form and content, to the categories of training material identified in Amazon's published research.

89. Amazon has not disclosed, and has refused to disclose, the sources of the voice training data used to develop its Foundational Voice Models. For example, Amazon's BASE TTS paper describes that data as "100,000 hours of public domain speech data," Amazon disclosed that Amazon Polly's generative engine was "trained with publicly available and proprietary data", and Amazon Nova Sonic and Nova 2 Sonic were trained through "licensed, proprietary, open-source, and publicly available" training data. The records identifying which specific voice recordings Amazon ingested into the training corpora that produced its Foundational Voice Models and the commercial voice products derived from those models are within Amazon's exclusive control.

90. No named Plaintiff created an Amazon Web Services account for Amazon Polly Brand Voice or Amazon Connect Voice ID enrollment. No named Plaintiff uploaded a voice recording to Amazon's ACX narrator voice replicas program, Audible AI narration program, or any other Amazon voice-synthesis product. No named Plaintiff accepted Amazon's AWS Biometric Notice and Consent Terms. No named Plaintiff recorded a voice-talent acknowledgment

statement for Amazon. No named Plaintiff received any notice or disclosure from Amazon that their voiceprint or biometric information had been collected, any disclosure of the purpose or duration of that collection, or executed a written release authorizing Amazon to use their voice for voice-synthesis training. Amazon's collection of each named Plaintiff's voiceprint, and Amazon's continuing possession and commercial exploitation of that voiceprint, occurred and continues without that Plaintiff's knowledge or consent.

91.     The injury Amazon inflicted on each named Plaintiff is concrete and particular to that Plaintiff and shares the same structure across all of them. Amazon extracted each Plaintiff's voiceprint from recordings the Plaintiff produced in Illinois, encoded that voiceprint in the Foundational Voice Models, and continues to profit from those models and from the Voice Products built on them. The voiceprint cannot be recovered or replaced; it is the same biological and behavioral signature the Plaintiff uses to speak. The Voice Products Amazon built using the Plaintiff's voiceprint now operate in the same professional voice markets in which the Plaintiff built and continues to build a career, in a competitive position the Plaintiff neither chose nor authorized.

*Philip Rogers*

92.     Philip Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). His on-air work spans radio reporting at WBBM Newsradio, television reporting and anchoring at WMAQ-TV, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, mass

shootings, corruption trials, and major national and international events. Rogers has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, and multiple Peter Lisagor Awards from the Chicago Headline Club. The Lisagor Awards, conferred by Chicago's professional journalism organization, recognize excellence in journalism conducted within the Chicago metropolitan region. Rogers is a citizen and resident of Illinois and resides in this District; his voice and recordings were produced in Illinois while Rogers was physically present in Illinois.

93. Rogers's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio, continuously available through the NBC Chicago digital archive at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and on YouTube, including a career-retrospective interview conducted by the Illinois News Broadcasters Association in which Rogers reflects on four decades of on-air reporting. The platforms display metadata identifying Rogers as the speaker and Chicago as the production location. Rogers's body of work has been continuously available through these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint.

94. Rogers's injury is concrete and particular to him in the manner alleged at ¶ 91. The broadcast journalism market in which Rogers built his career, live broadcast reporting, on-air anchoring, and broadcast investigative

45

journalism, is the market in which the Voice Products now operate, against the same colleagues with whom Rogers worked.

*Carol Marin*

95.     Carol Marin is a five-decade investigative broadcast journalist whose career has been conducted substantially in and from Chicago. Her on-air work has aired on NBC (WMAQ-TV), CBS News (60 Minutes, 60 Minutes II, the CBS Evening News), WTTW (Chicago Tonight), CNN, and the Discovery Channel, and includes television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing. Marin has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, and the Sigma Delta Chi Ethics in Journalism Award. She has been inducted into the Chicago Journalism Hall of Fame. In 2025, the Governor of Illinois designated Marin a Lincoln Laureate and awarded her the Order of Lincoln, the State of Illinois's highest civilian honor. Marin is a citizen and resident of Illinois and resides in this District; her voice and recordings were produced in Illinois while Marin was physically present in Illinois.

96.     Marin's broadcast catalog comprises thousands of hours of single-speaker, studio-quality audio. Substantial portions of that catalog are continuously and publicly available through the Media Burn Independent Video Archive (mediaburn.org), a Chicago-based nonprofit archive that

preserves Marin's broadcast investigative reporting and documentary work; through the WTTW digital archive at news.wttw.com; through the NBC Chicago digital archive at nbcchicago.com; and on YouTube, where Marin's Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly accessible. Each platform displays metadata identifying Marin as the speaker, the producing program, and Chicago as the production location. Marin's body of work has been continuously available through these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint.

97. Marin's injury is concrete and particular to her in the manner alleged at ¶ 91. The broadcast and investigative journalism markets in which Marin built her five-decade career, television anchoring, investigative reporting, debate moderation, documentary narration, and long-form interviewing, are the markets in which the Voice Products now operate, against the same colleagues with whom Marin worked.

*Robin Amer*

98. Robin Amer is a journalist, podcast creator, audio producer, and on-air host who has produced the substantial majority of her audio work from Chicago. Amer is the creator, host, narrator, and showrunner of *The City*, the investigative podcast produced by USA Today over two seasons. Season 1 of *The City*, which focused on Chicago, peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts. Amer's earlier production work for

*Gravy*, the podcast produced by the Southern Foodways Alliance, contributed to that program's 2015 James Beard Award for Best Podcast. Amer subsequently spent three years as Senior Producer for Audio Features at *The Washington Post*, where she edited the *Post Reports* daily news podcast and produced the standalone narrative series *Field Trip*; during her tenure she won or was a finalist for the Alfred I. duPont–Columbia University Award for three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she managed production of *Blood Memory*, a ten-part narrative series that won the 2025 Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction and was shortlisted for the Whickers Prize at the Sheffield Documentary Festival. Amer is a citizen and resident of Illinois and resides in this District; the substantial majority of Amer's voice recordings were produced in Illinois while Amer was physically present in Illinois.

99. *The City, Gravy, Post Reports, Field Trip, Love + Radio: Blood Memory,* and Amer's contributions to *Reveal*, *The Heist*, and *Vox* are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, and other major podcast and digital-audio platforms, with metadata identifying Amer as host, narrator, producer, showrunner, or contributor. *The City* and other Amer work were also distributed through Google Podcasts before Google shut down that service in 2024. Amer's body of audio work has been continuously available across these channels for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint. Amazon Music, an Amazon-owned platform, has directly hosted and distributed several

of Amer's productions, including *Love + Radio: Blood Memory*; in connection with that distribution, Amazon has directly possessed and controlled copies of those recordings.

100. Amer's injury is concrete and particular to her in the manner alleged at ¶ 91. Amer is presently a working audio producer, host, and managing editor in long-form investigative podcasting — the market the Voice Products are designed to serve at substantially lower cost than the human production Amer provides. The Voice Products are distributed in part through Amazon Music, the same Amazon-owned platform on which Amer's human production has been hosted, including Love + Radio: Blood Memory.

*Lindsey Dorcus*

101. Lindsey Dorcus is a professional audiobook narrator who has recorded more than two hundred audiobooks for many of the largest publishers in the English-language publishing industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus is a Society of Voice Arts and Sciences (SOVAS) Voice Arts Award winner, recognized in 2020 as part of the full-cast voice artist ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*. Dorcus is also a 2021 Independent Audiobook Award winner for LGBTQ+ audiobook narration. AudioFile Magazine, the principal independent trade publication reviewing audiobook narration in the United States, has reviewed Dorcus's narration as "silky," "joyful," and capable of "drawing listeners in with

49

the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (both Dublin and Northern Irish), French, American Southern, Greek, New England, New York, German, Indian, and Russian. Dorcus is a citizen and resident of Illinois and resides in this District; her audiobook narrations were recorded in a professional home studio in Chicago and produced in Illinois while Dorcus was physically present in Illinois.

102.  Dorcus's audiobook narration is publicly distributed across the major audiobook and digital-audio platforms, including Audible (a wholly owned subsidiary of Amazon.com, Inc.), Apple Books, Google Play Books, Spotify, Libro.fm, Chirp, and Scribd/Everand. Her complete catalog of narrated titles is searchable and accessible on Audible.com. The recordings are continuously available on these platforms and have been so available for years preceding Amazon's training of the Foundational Voice Models alleged in this Complaint. Because Audible is an Amazon-owned subsidiary and the principal commercial distributor of Dorcus's narrations, Amazon has directly possessed and controlled copies of Dorcus's audiobook recordings since they were first distributed through Audible, in many cases years before Amazon launched the voice synthesis products at issue in this Complaint. Audible's audiobook catalog is the most concentrated source of professional audiobook narration in the world.

103. Dorcus's injury is concrete, particular, and ongoing in the manner alleged at ¶ 91, and is sharpened by the closed-loop structure of Amazon's audiobook commerce: Audible AI narration, ACX narrator voice replicas, and Kindle Direct Publishing Virtual Voice operate within the same Amazon distribution ecosystem that has sold Dorcus's two-hundred-plus human narrations. For Dorcus, the biometric data and the product are, at this point, the same thing. The audiobook narrations Amazon distributed through Audible became the training material for the AI narration Amazon now sells through Audible, displacing the human narration market from which Dorcus's recordings came.

*Yohance Lacour*

104. Yohance Lacour is a writer, journalist, audio storyteller, playwright, and entrepreneur from the South Side of Chicago whose professional work centers on storytelling about Black Chicago. Lacour is affiliated with the Invisible Institute, a Chicago-based nonprofit investigative journalism organization on the South Side. Lacour is the creator, host, writer, and lead reporter of the seven-part investigative and memoir podcast *You Didn't See Nothin'*, a production of the Invisible Institute and USG Audio. In the series, Lacour revisits the 1997 hate-crime attack on Lenard Clark that Lacour had covered as a young community journalist, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped his own life. Lacour serves as the on-air voice, narrator, and lead reporter throughout the series. In 2024, *You Didn't See Nothin'* was awarded

the Pulitzer Prize for Audio Reporting, one of the highest honors in American journalism. In the same year, *You Didn't See Nothin'* was awarded a Peabody Award. *You Didn't See Nothin'* was named among Apple Podcasts' "Podcasts We Love" and the "100 Best Podcasts of All Time," received nominations at the Signal Podcasting Awards in the categories of Limited Series & Specials – Best Host and Limited Series & Specials – Documentary, and received four nominations at the Black Podcasting Awards in the categories of Best Sound Design, Best History Podcast, Best True Crime Podcast, and Best Limited Series Podcast. Lacour has also appeared as a featured guest and interview subject on NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* podcast with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast. Lacour is a citizen and resident of Illinois and resides in this District; his recorded vocal performances were produced in Illinois while Lacour was physically present in Illinois.

105. *You Didn't See Nothin'* and Lacour's interview appearances are publicly distributed across Apple Podcasts, Spotify, iHeartRadio, YouTube, Amazon Music, Overcast, and other major podcast and digital-audio platforms, with metadata identifying Lacour as creator, host, narrator, and lead reporter. The recordings are continuously available on these platforms and have been so available since 2023 (preceding Amazon's training of multiple voice models alleged in this Complaint). Amazon Music, an Amazon-owned platform, has

directly distributed *You Didn't See Nothin'*; in connection with that distribution, Amazon has directly possessed and controlled copies of the recordings.

106.   Lacour's injury is concrete and particular to him in the manner alleged at ¶ 91. The investigative and narrative podcast markets in which Lacour earns his livelihood — including markets reaching the Black audiences and communities about whom Lacour reports — are markets the Voice Products are designed to serve at a fraction of the cost of human production. The Voice Products are distributed in part through Amazon Music, the same Amazon-owned platform on which Lacour's You Didn't See Nothin' is hosted.

*Victoria Nassif*

107.   Victoria Nassif is a first-generation Lebanese-Palestinian American professional actor, audiobook narrator, voiceover artist, and intimacy director. Nassif is a trained mezzo-soprano singer whose vocal performance skills extend beyond spoken narration to musical and singing capabilities developed through her classical acting training. Nassif's on-camera work includes multiple episodes of NBC's *Chicago PD* (Season 12) and nationally broadcast commercials. Nassif is a professional audiobook narrator who has recorded multiple audiobooks for major publishers, including Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Nassif's notable audiobook narration credits include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which she served as solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher

53

(Random House Audio), a novel featuring a queer Palestinian American protagonist, which was shortlisted for the Ursula K. Le Guin Prize and named a *Them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers. As a first-generation Lebanese-Palestinian American who speaks Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern characters and settings; this authentic voice work represents a distinctive professional asset in the audiobook narration industry. Nassif possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. Nassif is a citizen and resident of Illinois and resides in this District; her recorded vocal performances were produced in Illinois while Nassif was physically present in Illinois.

108. Nassif's audiobook narration is publicly distributed across major audiobook and digital-audio platforms, including Audible (a wholly owned subsidiary of Amazon.com, Inc.), Apple Books, Spotify, Libro.fm, and other major audiobook retailers and subscription services. Nassif's on-camera work for NBC's *Chicago PD* and nationally broadcast commercials is distributed across broadcast and streaming platforms, including NBC and Peacock. Nassif's audiobook recordings are continuously available on these platforms and have been so available for years preceding Amazon's training of the

Foundational Voice Models alleged in this Complaint. Because Audible is an Amazon-owned subsidiary and the principal commercial distributor of Nassif's audiobook narrations, Amazon has directly possessed and controlled copies of Nassif's audiobook recordings since they were first distributed through Audible. Nassif's distinctive cultural and linguistic position — authentic Lebanese-Palestinian American narration with native Arabic-accent capability — is a category of professional voice work uniquely valuable for training the polyglot and multi-accent voice capabilities Amazon markets in Amazon Polly's multilingual neural voices, Amazon Nova Sonic and Nova 2 Sonic polyglot voices, and Audible's speech-to-speech translation feature that "preserves original narrators' voice and style across languages." Amazon's commercialization of multilingual and accented voice synthesis depends on training audio from narrators with authentic accented narration capabilities.

109. Nassif's injury is concrete, particular, and ongoing in the manner alleged at ¶ 91. Nassif occupies a distinctive market position as a Lebanese-Palestinian American narrator providing authentic Arabic-accented narration of works by Arab and Palestinian American authors. Audible's announced speech-to-speech translation feature, which 'preserves original narrators' voice and style across languages,' is precisely the capability that targets Nassif's distinctive professional asset for substitution by AI-generated voice content. As for Dorcus, the audiobook narrations Amazon distributed through Audible became the training material for the AI narration Amazon now sells through

Audible, displacing the human narration market from which Nassif's recordings came.

*Amazon Acted Willfully and Recklessly*

110.  Amazon's collection, retention, commercial exploitation, and dissemination of Plaintiffs' and Class members' voiceprints without notice or consent was not the result of inadvertence or unfamiliarity with BIPA. Amazon acted with knowledge of, or at a minimum reckless disregard for, its obligations under Illinois law.

*Amazon knew its obligations under BIPA*

111.  By the time Amazon launched any of the Voice Products, see ¶ 42, BIPA had been the law of Illinois for more than fifteen years and had generated some of the largest privacy settlements in American history: approximately $650 million in In re Facebook Biometric Information Privacy Litigation, No. 3:15-cv-03747 (N.D. Cal.); approximately $100 million in Rivera v. Google LLC, No. 2019-CH-00990 (Cir. Ct. Cook Cnty.); and approximately $92 million in In re TikTok, Inc., Consumer Privacy Litigation, No. 1:20-cv-04699 (N.D. Ill.). The Illinois General Assembly enacted BIPA in 2008, and its findings on the unique vulnerability of biometric identifiers, expressly including the voiceprint, are a matter of legislative record. 740 ILCS 14/5.

112.  Voice-AI-specific litigation against companies in Amazon's same product market further sharpened the notice. In May 2024, voice actors filed *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y. filed May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice

clones trained on the plaintiffs' recordings. In August 2024, additional voice actors filed *Vacker v. ElevenLabs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), asserting analogous claims against another AI voice company. By the time Amazon released the products at issue in this Complaint, voice-AI companies were active defendants in litigation alleging precisely the conduct alleged here: building commercial voice synthesis products on voice recordings ingested without the speakers' consent.

113. Amazon's notice was not inferred from industry conditions; it was direct and adjudicated. Amazon was sued in this District in 2019 for BIPA violations based on Voice ID — *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.) — and the case has been active throughout the period in which Amazon launched the Voice Products. On November 6, 2025, the District Court certified a class of approximately 1.2 million Illinois residents. Wilcosky, Dkt. 278 (N.D. Ill. Nov. 19, 2025). Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings.

114. In May 2023, the FTC and DOJ obtained a $25 million civil penalty and a stipulated permanent injunction against Amazon for retaining children's Alexa voice recordings indefinitely. The FTC characterized the retained recordings as providing Amazon "'with a valuable database for training the Alexa algorithm." Amazon entered the stipulated injunction without contesting that characterization, and in each of the four years that followed, Amazon launched additional Voice Products dependent on training data of identifiable speakers.

*Amazon knew that voice training*
*extracts biometric identifiers*

115.   Amazon's product documentation describes the outputs of its voice processing pipelines in terms that align precisely with BIPA's biometric-identifier definitions. AWS's Amazon Connect Voice ID administrator guide uses the BIPA statutory term "voiceprint" and defines it as "a mathematical representation that implicitly captures unique aspects of an individual's voice." AWS's Amazon Chime SDK API reference describes its speaker-search system as collecting "biometric identifiers and biometric information … in the form of a digital voiceprint," using BIPA's own statutory language. Amazon's BASE TTS research paper describes a one-billion-parameter Transformer that demonstrates one-shot voice cloning from a ten-second reference recording. This capability requires extracting and encoding speaker-specific acoustic characteristics from training audio.

116.   Amazon's AWS Biometric Notice and Consent Terms, last updated November 14, 2024, identify BIPA, the Texas Capture or Use of Biometric Identifier Act, and the Washington biometric privacy statute by name, and require AWS customers using Covered AWS Services to obtain "informed written or explicit consent." Amazon does not treat BIPA as a remote or theoretical concern. Amazon places BIPA at the center of its own customer-facing biometric compliance framework, and then built the Voice Products on the very pipelines that compliance framework would have governed.

58

*Amazon chose to apply consent selectively*

117. The most probative evidence of Amazon's willfulness is the contrast between the consent infrastructure Amazon built for voice categories it collects with the participation of customers, voice talent, or narrators, and the absence of any equivalent consent infrastructure for the voice category at issue in this Complaint — the voiceprints Amazon extracted from non-user training audio.

118. Amazon built BIPA-aware consent infrastructure for its customer-facing voice services. Amazon Connect Voice ID activation is conditioned on customer acceptance of a "BIPA Consent Acknowledgement." Amazon Chime SDK speaker search ships with sample BIPA-oriented written-release language for use with Illinois callers. The AWS Biometric Notice and Consent Terms, which apply not only to Voice ID and Chime SDK but also to Amazon Rekognition and Amazon One Enterprise Services, allocate BIPA, Texas CUBI, and Washington biometric-statute compliance obligations to AWS customers and require them to obtain informed written consent from data subjects.

119. Amazon built consent and approval infrastructure for the voice talent it collects with the talent's direct participation. Amazon Polly Brand Voice is a limited-access program requiring voice-talent registration and recorded acknowledgment statements. The ACX narrator voice replicas beta requires participating narrators to submit sample recordings, choose projects, and review final narration, and provides that Audible "will not separately use the narrator voice replica without approval." Audible's May 2025 AI narration

program for publishers operates on publisher consent flows for each audiobook to be AI-generated.

120. Amazon built downstream-use safeguards for the synthetic outputs of its voice products. The AWS Responsible AI Policy prohibits depicting a person's voice or likeness without consent or appropriate rights, including unauthorized impersonation. The Amazon Nova Sonic and Amazon Nova 2 Sonic service cards describe built-in content moderation, watermarking, and warnings against impersonation without consent.

121. Each of these measures was implemented because Amazon recognized that voice-based AI products require the consent of the people whose voices are used. Each was implemented at the customer-facing end of the pipeline, either where Amazon collects voice data with the data subject's participation or where Amazon governs downstream customer use of synthetic outputs. None was implemented for the upstream voice category at issue in this Complaint: the voiceprints Amazon extracted from non-user training audio to build the Foundational Voice Models on which Amazon's customer-facing products depend.

122. The same engineering organizations and the same legal department that built and drafted the customer-facing consent infrastructure also built the Foundational Voice Models, which were trained on the unconsented corpus. The decision to apply consent in one place and to withhold it in the other was a contemporaneous institutional choice.

*Amazon's allocation of BIPA compliance
to its customers confirms awareness*

123.   Amazon's contractual treatment of BIPA compliance independently establishes Amazon's awareness that its voice processing requires BIPA-compliant consent. The AWS Biometric Notice and Consent Terms, quoted at ¶ 117 requires AWS customers using "Covered AWS Services," including Amazon Connect Voice ID and Amazon Chime SDK speaker search, to comply with BIPA by name and to obtain informed written consent from data subjects.

124.   That allocation reflects Amazon's recognition that its voice processing implicates biometric data subject to BIPA. A company that disclaims responsibility for compliance by allocating it to others has not pleaded ignorance of the obligation — it has acknowledged the obligation and pushed it downstream.

125.   The allocation framework, however, does not reach the voiceprints at issue in this Complaint. It applies to voice data collected through AWS customer–controlled workflows and, on its face, cannot apply to voiceprints that Amazon itself extracted from third-party recordings to train the Foundational Voice Models — voiceprints obtained outside any AWS customer relationship, where no customer can be held responsible. As applied to those voiceprints, Amazon is the controller. Amazon is the entity that collected the data. Amazon is the entity that possesses the data. The duty Amazon's Biometric Notice and Consent Terms allocates to others falls, with respect to Plaintiffs' voiceprints, on Amazon itself.

61

126. On information and belief, Amazon's decision to train the Foundational Voice Models without BIPA compliance was a commercial calculation. BIPA-compliant collection would have required Amazon to identify each source speaker, provide written notice of the specific purpose and duration of collection, and obtain a written release before ingesting the recording. With corpora comprising the recordings of hundreds of thousands of distinct speakers, BIPA compliance would have constrained the speed and scale of Amazon's voice-AI development. Amazon chose speed and scale over compliance.

127. Amazon protects what it values. It does not protect what it took without consent. That was not an oversight. It was a business decision.

128. Each of the violations alleged in this Complaint was committed by Amazon with knowledge of, or in reckless disregard for, BIPA's requirements. Plaintiffs and Class members are entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1), recoverable on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026).

## CLASS ACTION ALLEGATIONS

129. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings

were produced or recorded in Illinois, and from whose recordings Amazon extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of any of the Foundational Voice Models or any of the Voice Products, during the Class Period.

130. The Class Period runs from the earlier of (a) the date Amazon first ingested any voice recording into the training, fine-tuning, or evaluation pipeline for any of its voice synthesis or voice cloning models, or (b) January 1, 2013, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period.

131. Excluded from the Class are: (i) Amazon.com, Inc. and each of its parents, subsidiaries, affiliates, and controlled entities, including without limitation Amazon Web Services, Inc., Amazon.com Services LLC, A2Z Development Center, Inc., Audible, Inc., Audiobook Creation Exchange (ACX), Twitch Interactive, Inc., IMDb.com, Inc., Ring LLC, MGM Holdings Inc., and IVONA Software sp. z o.o.; (ii) all current and former officers and directors of Amazon and its subsidiaries; (iii) Amazon's employees, contractors, agents, and counsel; (iv) the Court, the Court's staff, and any jurors assigned to this action; (v) the immediate family members of any person excluded above; (vi) any person who, prior to Amazon's collection or use of their voice biometric identifiers or biometric information, executed a written release that, on its face, purports to authorize Amazon's use of their voice for training, fine-tuning, or operation of voice synthesis or voice cloning models; and (vii) all natural

persons whose only voiceprint created by Amazon is the Voice ID enrollment voiceprint at issue in *Wilcosky v. Amazon.com, Inc.*, No. 1:19-cv-05061 (N.D. Ill.), provided that a person who is a member of the *Wilcosky* class is not excluded from this Class if Amazon also extracted a voiceprint from that person's voice recordings in connection with the development, training, fine-tuning, evaluation, or operation of the Foundational Voice Models or the Voice Products.

132.   Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

133.   *Ascertainability.* Class membership is defined by objective criteria. Whether a particular voice recording entered the training, fine-tuning, or evaluation pipeline for any of the Foundational Voice Models is a binary factual question, and the records that answer it — training-data manifests, ingestion logs, dataset-version records, source-URL records, and audio-file metadata — are within Amazon's exclusive control. For recordings distributed through Amazon-owned platforms (Audible, Amazon Music, ACX, Kindle), Amazon also maintains comprehensive distribution metadata identifying speaker identity, geographic location of production, and content catalog. Class membership can be independently confirmed through publicly available distribution metadata on third-party platforms, through speaker-identification technology applied to Amazon's training corpus, and through voice-matching analysis comparing the

Voice Products' outputs against publicly available recordings of Class members.

134. *Numerosity.* Joinder is impracticable. Fed. R. Civ. P. 23(a)(1). On information and belief, the number of speakers whose Illinois-recorded voice work was ingested into the training pipelines for the Foundational Voice Models runs to the hundreds of thousands. Amazon's training-data scale, alleged at ¶¶ 8, 43, 51, requires that order of magnitude. The Class includes (a) the broadcast journalists, podcasters, audiobook narrators, voice actors, voiceover artists, and other professional voice talent who produced work in Illinois during the Class Period and (b) the interviewees, guests, panelists, callers, public officials, and other speakers whose voices were captured in Illinois-produced broadcast, podcast, audiobook, and archival audio content publicly accessible on the platforms from which, on information and belief, Amazon sourced training data. The exact number is within Amazon's exclusive control and will be established through discovery.

135. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). Amazon did not engage in any individualized notice, consent, retention-policy disclosure, written release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into Amazon's voice-model training, fine-tuning, or evaluation pipelines. Amazon's conduct was uniform: the same training pipelines ingested the same categories of voice recordings under the same absent-consent posture, applied to every Class member through the same

automated and standardized process. The questions whether Amazon complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements before and after extracting Class members' voiceprints can be answered classwide because Amazon's noncompliance was identical as to every Class member.

136. Common questions of law and fact include, without limitation:

(a) whether the computational representations of vocal characteristics Amazon extracts during voice-model training — variously described in Amazon's product and research documentation, *see* ¶¶ 45–47 — constitute 'voiceprints' or 'biometric information' within the meaning of BIPA;

(b) whether Amazon informed Class members in writing that their biometric identifiers were being collected or stored, of the specific purpose and length of term of collection, and obtained a written release executed by the Class member, as 740 ILCS 14/15(b) requires;

(c) whether Amazon developed and made publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, as 740 ILCS 14/15(a) requires;

(d) whether Amazon sold, leased, traded, or otherwise profited from Class members' biometric identifiers and biometric information through its integrated commercial chain — including the Voice Products — in violation of 740 ILCS 14/15(c);

(e) whether Amazon disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers and biometric information to third parties — including without limitation Amazon's affiliated corporate entities (Audible, ACX, AWS, Amazon Music, IVONA, and others), Amazon's cloud-infrastructure subprocessors, and Amazon's named Nova 2 Sonic integration partners (Vonage, Twilio, AudioCodes, LiveKit, and Pipecat) — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

(f) whether Amazon stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care required by 740 ILCS 14/15(e)(1) and in a manner equally or more protective than its protection of other confidential and sensitive information as required by 740 ILCS 14/15(e)(2);

(g) whether Amazon's conduct was willful or reckless within the meaning of 740 ILCS 14/20(2);

(h) whether Amazon used Class members' voices and identities for commercial purposes without prior written consent in violation of the Illinois Right of Publicity Act, 765 ILCS 1075/30(a);

(i) whether Amazon's voice products generate, distribute, or make available unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by P.A. 103-836 (effective January 1, 2025), and whether Amazon materially contributes to or facilitates the distribution of such replicas through the Voice Products;

67

(j)      whether Amazon's conduct constitutes an unfair practice within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act under *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002), and independently a deceptive practice within the meaning of the same statute;

(k)      whether Amazon's conduct constitutes deceptive trade practices likely to cause confusion or misunderstanding as to the source, sponsorship, approval, or certification of AI-generated voice content under 815 ILCS 510/2(a)(2), and as to affiliation, connection, or association with or certification by another under 815 ILCS 510/2(a)(3);

(l)      whether Amazon was unjustly enriched by its unauthorized commercial use of Class members' voice data; and

(m)      the appropriate measures of damages, restitution, and injunctive relief, including the destruction or retraining of the Foundational Voice Models in which Class members' voiceprints are encoded and the downstream commercial products built on those models.

137.   *Typicality.* The named Plaintiffs' claims are typical of the Class's claims. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois. Amazon, on information and belief, ingested those recordings into the training pipelines for the Foundational Voice Models without notice, consent, or written release. With respect to Plaintiffs Dorcus and Nassif, whose audiobook narrations are distributed through Audible, and Plaintiffs Amer and Lacour, whose work is distributed through Amazon Music, Amazon already

directly possessed and controlled the source recordings as a corporate matter before any training-data ingestion. The legal theories asserted on behalf of the Class apply with equal force to each named Plaintiff and to every other Class member.

138. *Adequacy.* Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the absent Class members; each named Plaintiff has the same incentive as every other Class member to maximize recovery and to obtain comprehensive injunctive relief addressing the unlawful extraction of voiceprints. Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

139. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because Amazon has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Amazon's training pipelines operated uniformly across every Class member's voice recordings; Amazon's failure to obtain BIPA-compliant consent was uniform; Amazon's failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; and Amazon's continuing possession, commercial exploitation, and cross-affiliate and subprocessor dissemination of Class members' voiceprints — in the Foundational Voice Models that power the Voice Products — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20,

69

815 ILCS 510/3 (which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the Foundational Voice Models in which Class members' voiceprints are encoded, and the destruction of the downstream commercial products built on those models — that necessarily applies on the same terms to every Class member.

140. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

141. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. *First,* whether Amazon's voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, as alleged at ¶¶ 45-49. *Second*, whether Amazon complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and biometric-data-protection requirements is a common legal question with a common answer — Amazon did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. *Third,* whether Amazon's conduct was willful or reckless turns on Amazon's institutional knowledge, decision-making, and contemporaneous conduct, as alleged at ¶¶ 110-128, all of which are common

70

to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from Amazon's own records, which include training-data manifests, ingestion logs, source-URL records, audio-file metadata, and the platform distribution metadata for the audiobooks, music, and other content Amazon directly possesses through Audible, ACX, Amazon Music, and Kindle, all in Amazon's exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20, as amended by Public Act 103-769 (effective August 2, 2024) and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

142. *Superiority.* A class action is the superior method for adjudicating these claims:

*(a)* *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists, voice actors — and incidental speakers whose voiceprints were extracted without their knowledge. Many Class members remain unaware that their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against the largest publicly traded technology company in the world, with statutory damages amounts that, while meaningful in the aggregate, are likely too modest in individual cases to justify

71

the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b)    *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against Amazon on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train the Foundational Voice Models. The certified *Wilcosky* class, alleged at ¶ 58, 113, is composed of Alexa users who completed Amazon's in-app Voice ID enrollment, and the certification record in *Wilcosky* turns on the uniformity of Amazon's enrollment workflow, a customer-initiated biometric-capture event that is not present in this case and that has no application to non-user training-data subjects. See *Wilcosky*, Dkt. 278 (N.D. Ill. Nov. 19, 2025). The claims here arise from Amazon's extraction of voiceprints from non-user voice recordings that no Plaintiff or Class member submitted to Amazon, that no Plaintiff or Class member encountered in any Amazon enrollment workflow, and to which no Amazon customer-facing disclosure applied. The two cases address two different categories of Amazon voice processing. Amazon's 2025 Form 10-K acknowledges additional pending BIPA proceedings involving Alexa, AWS cloud services, and Amazon Connect. Voice-AI-specific litigation against other defendants, see ¶ 112, concerns AI voice companies other than Amazon and asserts overlapping but non-identical theories.

(c)    *Desirability of concentration in this forum.* Concentrating this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois

statutes. The injuries were suffered in Illinois. Amazon conducts substantial commercial business in Illinois, including through retail, fulfillment, AWS enterprise licensing, Audible subscriptions, Amazon Music subscriptions, Alexa device sales, and Alexa+ subscriptions sold to Illinois residents and Illinois-based businesses. This Court is already the forum for the related *Wilcosky* BIPA litigation against the same defendant and is well-suited to adjudicate BIPA and other Illinois statutory claims arising from Amazon's commercial conduct in Illinois.

(d)     *Manageability.* The case is manageable as a class action. Amazon's conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from Amazon's records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

143.   To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by Amazon's concealment of its training-data sources, by Amazon's failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that Amazon had ingested their recordings into its training pipelines, and by the continuing nature of Amazon's violations. Independently,

each retention of the unlawfully obtained biometric data, each operation of the Foundational Voice Models in which the unlawfully obtained biometric data is encoded, each disclosure or transmission of that biometric data, and each public release of model parameters encoding that biometric data is a separate violation of BIPA under *Cothron v. White Castle System, Inc.*, 2023 IL 128004 (Ill. 2023), each accruing a separate limitations period from the date of the discrete violative act.

## CLAIMS FOR RELIEF

### Count I

### *Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)*

*Brought on behalf of the Class*

144.   Plaintiffs reallege and incorporate by reference all allegations in this complaint.

145.   Plaintiffs bring this Count individually and on behalf of the Class.

146.   BIPA defines "biometric identifier" to include a "voiceprint" and "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first informs the subject in writing that biometric data is being collected or stored, informs the subject in writing of the

74

specific purpose and length of term of collection, and receives a written release executed by the subject. 740 ILCS 14/15(b).

147. Amazon is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

148. Amazon collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class members by directly accessing their voice recordings on publicly accessible third-party platforms and on Amazon-owned distribution platforms (including Audible, Amazon Music, ACX, and Kindle), ingesting those recordings into its voice-model training pipelines, and extracting from those recordings computational representations capable of identifying the speakers, as alleged at ¶¶ 33 and ¶¶ 50–58. The resulting representations, which Amazon's own product documentation describes as "voiceprints," "digital voiceprints," "voice profiles," "speaker embeddings," "speechcodes," and "biometric identifiers and biometric information," are voiceprints and biometric information within the meaning of BIPA.

149. Amazon did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored, did not inform any of them in writing of the specific purpose or length of term of collection, and did not receive a written release executed by any of them. Amazon obtained no consent of any kind, in any form, from any Plaintiff or Class member, as alleged at ¶¶ 60, 90, and 117-122.

150. Amazon's violations of § 15(b) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

151. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

152. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

153. Plaintiffs bring this Count individually and on behalf of the Class.

154. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers has been satisfied or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never

interacted with Amazon in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers be destroyed when the initial purpose for their collection has been satisfied.

155. Amazon has been, and remains, in possession of voiceprints and biometric information extracted from the recordings of Plaintiffs and Class members.

156. Amazon has not developed and made publicly available a retention and destruction policy applicable to voiceprints extracted from non-user training audio and embedded in the parameters of Amazon's voice synthesis and voice cloning models, as alleged at ¶¶ 60 and 78. Amazon's public retention statements address only customer-controlled enrollment voiceprints in Amazon Connect Voice ID domains, governed by the AWS-customer relationship and inapplicable to non-user training-data subjects. Amazon has not provided, and on information and belief does not maintain, any mechanism by which Plaintiffs or other non-user training-data subjects can request access to, correction of, or deletion of their biometric data from the training data underlying the Foundational Voice Models.

157. Amazon's violations of § 15(a) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

158. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count III

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

159. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

160. Plaintiffs bring this Count individually and on behalf of the Class.

161. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

162. Amazon has profited and continues to profit from Plaintiffs' and Class members' voiceprints and biometric information by using them to develop, train, and commercially operate the Foundational Voice Models that power the Voice Products, and by monetizing the Voice Products through the integrated commercial chain alleged at ¶¶ 71-73. The voice quality, expressiveness, multilingual capability, and speaker similarity that Amazon sells through that chain exists because of the voiceprints encoded in the Foundational Voice Models, including, on information and belief, voiceprints extracted from Plaintiffs' and Class members' Illinois-recorded voice work. Amazon's commercial exploitation does not fall within any exception to § 15(c).

163. Amazon's violations of § 15(c) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

164. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

**Count IV**

**Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)**

*Brought on behalf of the Class*

165. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

166. Plaintiffs bring this Count individually and on behalf of the Class.

167. Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

168. Amazon has disclosed, redisclosed, and otherwise disseminated Plaintiffs' and Class members' voiceprints and biometric information, encoded in the parameters of the Foundational Voice Models, in three categories of conduct, each independently sufficient to violate § 15(d) and each alleged at ¶¶ 74-79: (i) cross-affiliate transfers among Amazon's affiliated corporate entities, including AWS, Audible, ACX, Amazon Music, Amazon.com Services LLC, and IVONA Software sp. z o.o.; (ii) transmission to cloud-infrastructure subprocessors, vendors, and service providers in connection with training, evaluation, deployment, and operation of the Voice Products; and (iii) deployment to named integration partners for Amazon Nova 2 Sonic, including Vonage, Twilio, AudioCodes, LiveKit, and Pipecat.

79

169. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

170. Amazon's violations of § 15(d) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

171. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

### Count V

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(e)

*Brought on behalf of the Class*

172. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

173. Plaintiffs bring this Count individually and on behalf of the Class.

174. Section 15(e) of BIPA requires a private entity in possession of biometric identifiers or biometric information to store, transmit, and protect the identifiers and information from disclosure (1) using the reasonable standard of care within the entity's industry, and (2) in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e). Section 15(e)(2) imposes an asymmetry test: a private entity satisfies § 15(e)(2) only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

80

175. Amazon fails the § 15(e)(2) asymmetry test. Amazon protects its own confidential and sensitive information — and the confidential and sensitive information its AWS customers entrust to its closed services — under materially more protective controls than it applies to the voiceprints and biometric information it extracted from non-user training audio.

176. Amazon protects its own confidential information and its AWS-customer-uploaded biometric data, including Amazon Connect Voice ID enrollment voiceprints, under closed-system controls described at ¶ 78. Amazon's treatment of voiceprints extracted from non-user training audio is materially less protective: those voiceprints are encoded in the parameters of the Foundational Voice Models and disseminated across Amazon's cross-affiliate, subprocessor, and integration-partner network, as alleged at ¶¶ 74-79, without any access-control protocol, audit-logging policy, encryption standard, retention schedule, destruction policy, or subject-access mechanism specifically applicable to that voice category.

177. Independently, Amazon fails the § 15(e)(1) reasonable-standard-of-care test. The reasonable standard of care in the AI and machine-learning industry for the handling of biometric training data includes, at minimum, documented provenance, access controls, audit logging, encryption in storage and transit, a documented retention and destruction schedule, and a subject-access and deletion mechanism. Amazon has none of these, as alleged at ¶ 60 and ¶ 78. A private entity cannot adequately protect biometric data belonging to individuals to whom it has never disclosed possession of their data.

178. The asymmetry between Amazon's closed-system protection of its own confidential information and its AWS-customer-uploaded data, on one hand, and Amazon's undisclosed and uncontrolled dissemination of training-derived voiceprints across Amazon's cross-affiliate, subprocessor, and integration-partner network, on the other, violates § 15(e)(2)'s requirement that biometric data be protected "in a manner that is the same as or more protective than" Amazon's protection of its other confidential and sensitive information.

179. The asymmetry is reinforced by Amazon's own internal selectivity: Amazon built consent infrastructure for the voice categories it collects with customer or narrator participation, but built none for the voiceprints it extracted from non-user training audio, as alleged at ¶¶ 117-122. The decision was a contemporaneous institutional choice.

180. Amazon's violations of § 15(e) were intentional or reckless, as alleged at ¶¶ 110–128. In the alternative, Amazon's violations were negligent.

181. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count VI

### Violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

182. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

183. Plaintiffs bring this Count individually and on behalf of the Class.

82

184. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. 765 ILCS 1075/30(a) provides that "[a] person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous written consent from the appropriate person." IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5.

185. Each Plaintiff and each Class member is an individual whose distinctive voice, including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression, is part of the individual's identity within the meaning of IRPA.

186. Amazon used Plaintiffs' and Class members' identities for commercial purposes within the meaning of IRPA by extracting and modeling the distinctive vocal characteristics embodied in their recordings and using those characteristics to develop, train, and operate the commercial voice synthesis and voice cloning products that Amazon monetizes through the integrated commercial chain alleged at ¶¶ 71-73. Amazon holds out its products' ability to generate realistic, expressive, and human-sounding voices — across the Voice Products, including Audible's speech-to-speech translation that "preserves original narrators' voice and style across languages." — as a core commercial feature of those products. That capability was built from the vocal identities of the individuals whose recordings were used to train the

Foundational Voice Models. Amazon did not obtain previous written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

187. Independently, the Illinois Right of Publicity Act, as amended by Public Act 103-836 (effective January 1, 2025), prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent or the consent of an authorized representative. The amended IRPA further imposes liability on any person who materially contributes to, induces, or facilitates such distribution.

188. Amazon knowingly distributes, transmits, and makes available to the general public sound recordings containing unauthorized digital replicas of voice talent within the meaning of the amended IRPA. Audible (an Amazon-owned subsidiary) publicly announced on May 13, 2025 that it would offer publishers "speech-to-speech translation that preserves original narrators' voice and style across languages" — a technology that, by its terms, generates new sound recordings of a narrator's voice performing in languages and on words the narrator did not perform. ACX's narrator voice replicas beta similarly creates AI replicas of narrators' voices capable of producing audiobooks the narrator never recorded. Amazon's Polly generative engine, Amazon Nova Sonic, Amazon Nova 2 Sonic, Kindle Direct Publishing Virtual Voice, and Audible AI narration are each architected to generate synthetic speech whose vocal characteristics derive from the voice recordings used to train the underlying

84

Foundational Voice Models. On information and belief, the synthetic speech generated by these systems replicates or closely simulates the distinctive vocal characteristics of Plaintiffs and Class members whose voice recordings were ingested into the training pipelines, and Amazon knowingly distributes those replicas through the Voice Products. Amazon materially contributes to, induces, and facilitates the distribution of unauthorized digital replicas by designing, deploying, and operating the platforms and APIs through which the replicas are generated and distributed.

189. Amazon's violations of IRPA were willful and knowing, as alleged at ¶¶ 110-128. Amazon built consent and approval workflows for the voice categories it collects with the participation of voice talent precisely because it understood that the commercial use of an individual's voice requires that individual's consent; it did not apply the same infrastructure to the voices it took from Plaintiffs and Class members.

190. Plaintiffs and the Class have suffered and continue to suffer injury from Amazon's IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harms including the diversion of licensing value and the diminished demand for authentic vocal performances in the markets where Plaintiffs and Class members earn their livelihoods, as alleged at ¶¶ 80-87, 91.

191. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, the profits Amazon attributed to its

unauthorized use of Plaintiffs' and Class members' identities, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount, punitive damages, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

**Count VII**

**Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act,
815 ILCS 505/1 et seq.**

*Brought on behalf of the Class*

192.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

193.   Plaintiffs bring this Count individually and on behalf of the Class.

194.   The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices reaches conduct that offends Illinois public policy, is immoral, unethical, oppressive, or unscrupulous, or causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002). ICFA's deceptive-practices prong reaches material misrepresentations and material omissions made in connection with trade or commerce.

195.   Amazon engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis and

86

voice cloning services to Illinois customers, and by collecting, extracting, and commercially exploiting the biometric identifiers of Illinois persons in connection with that commerce.

196. Amazon's conduct is unfair within the meaning of ICFA. It offends Illinois public policy as expressed in BIPA, 740 ILCS 14/5, and IRPA, 765 ILCS 1075/30(a); it caused substantial injury to Plaintiffs and Class members, including diversion of licensing income and displacement in their professional voice markets, as alleged at ¶¶ 80-87, 91; and Plaintiffs and Class members could not reasonably have avoided that injury because they had no knowledge that Amazon was collecting their biometric data.

197. Amazon's conduct is independently deceptive within the meaning of ICFA in two respects. *First*, Amazon's AWS Biometric Notice and Consent Terms allocates biometric-law compliance obligations to AWS customers using "Covered AWS Services," and identifies BIPA, Texas CUBI, and the Washington biometric privacy statute by name, while remaining silent on Amazon's own collection of voiceprints from non-user training audio. The allocation framework affirmatively represents that biometric-law compliance is a customer responsibility while omitting that Amazon itself is collecting biometric identifiers, in volumes vastly exceeding the customer-side collection the terms address, without notice or consent. The omission is material because it conceals from consumers — including Illinois voice professionals whose work Amazon's commercial products now displace — that the Foundational Voice Models on which Amazon's customer-facing services depend were built using

voice recordings collected without speaker consent. *Second,* Amazon maintained material opacity about the sources of its voice training data, as alleged at ¶¶ 50, 60, while commercially exploiting the resulting Foundational Voice Models at scale.

198.   Amazon's unfair and deceptive conduct proximately caused actual economic injury to Plaintiffs and Class members, including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. Amazon's conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged at ¶¶ 110–128. Plaintiffs and the Class seek all relief available under ICFA, including actual damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

### Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

199.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

200.   Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

201.   The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes

likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

202. Amazon's commercial voice products generate voice outputs that sound like real human speakers, including voice outputs that, on information and belief, replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, streamed, embedded in Audible AI-narrated audiobooks, ACX-produced audiobooks, Kindle Direct Publishing Virtual Voice audiobooks, Alexa+ generative voice interactions, Amazon Connect contact-center deployments, and Amazon Bedrock Nova Sonic and Nova 2 Sonic conversational applications, and otherwise commercially exploited without consumer-facing disclosure that the voice was AI-generated, that the underlying models were built on voiceprints and biometric information collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding under 815 ILCS 510/2(a)(2) about the source, sponsorship, and approval of the AI-generated voice content, and under 815 ILCS 510/2(a)(3) about the affiliation, connection, or association between the speakers whose vocal characteristics are reproduced and the AI-generated content distributed through Amazon's platforms.

203. Plaintiffs and Class members are persons likely to be damaged by Amazon's deceptive practices within the meaning of 815 ILCS 510/3. Amazon's conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

204. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3, including injunctive relief requiring Amazon to provide adequate consumer-facing disclosure that voice outputs are AI-generated and that the individuals whose vocal characteristics are reproduced did not authorize the use. If the Court finds that Amazon has willfully engaged in deceptive trade practices within the meaning of 815 ILCS 510/3 — for the reasons alleged at ¶¶ 110–128 — Plaintiffs also seek reasonable attorneys' fees.

## Count IX

### Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Class*

205. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

206. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

207. Under Illinois common law, a defendant is liable for unjust enrichment when the defendant has unjustly retained a benefit to the plaintiff's

detriment, and the defendant's retention of that benefit violates fundamental principles of justice, equity, and good conscience.

208. Amazon obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, and identity attributes without permission and without compensation. These benefits include (a) the avoided costs of licensing or obtaining consent for the voice recordings used to train Amazon's voice synthesis and voice cloning models; (b) the product capability and competitive advantage Amazon captured by training its models on a diverse corpus of professional human voices, including the voices of Plaintiffs and Class members; and (c) the revenue Amazon generates and continues to generate through the commercial exploitation of those models across the integrated commercial chain alleged at ¶¶ 71-73.

209. Amazon obtained these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invested time, talent, training, and resources to develop their voices and create professional recordings. Amazon's unauthorized extraction of voiceprints from those recordings diverted economic value from Plaintiffs and Class members to Amazon, and Amazon's commercial deployment of products built on those voiceprints continues to compete with and displace Plaintiffs and Class members in the markets where they earn their livelihoods — most acutely in the audiobook-narration market, where Plaintiffs Dorcus and Nassif distribute professional narration through Audible, the same Amazon-owned platform on which Audible AI narration and ACX narrator voice replicas now operate.

210. Amazon's retention of these benefits is unjust. Amazon's retention is rooted in conduct requiring proof of elements qualitatively different from copyright's exclusive rights and therefore not preempted by federal copyright law: (a) Amazon's collection and commercial exploitation of Illinois residents' biometric identifiers without BIPA-compliant notice and written consent, and (b) Amazon's commercial use of Illinois residents' voices and identities without the written consent required by IRPA.

211. Amazon's institutional practice confirms the inequity of its retention: Amazon built consent and approval infrastructure for every voice category in which it collected with the data subject's participation, *see* ¶¶ 117-122, but did not apply equivalent infrastructure to Plaintiffs and Class members whose voices it took without consent. Amazon could have pursued a lawful licensing path; it chose not to.

212. Plaintiffs and the Class seek restitution of the benefits Amazon has unjustly retained, including disgorgement of profits Amazon earned from the unauthorized exploitation of Plaintiffs' and Class members' voiceprints and identities, an accounting of those benefits, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Amazon.com, Inc. and award the following relief:

A. *Injunctive Relief.* Permanent and, where appropriate, preliminary injunctive relief requiring Amazon, its officers, agents, employees, parents, subsidiaries, affiliates (including without limitation Amazon Web Services, Inc., Audible, Inc., Audiobook Creation Exchange (ACX), Amazon Music, Amazon.com Services LLC, A2Z Development Center, Inc., and IVONA Software sp. z o.o.), and all persons acting in concert with them, to:

(1) Cease the collection, capture, purchase, receipt through trade, or other obtaining of biometric identifiers and biometric information from voice recordings produced or recorded in Illinois without first providing the written notice, disclosure of specific purpose and duration of collection, and written release that 740 ILCS 14/15(b) requires;

(2) Cease the storage, retention, commercial use, sale, lease, trade, profiting from, and dissemination of voiceprints and biometric information of Plaintiffs and Class members that Amazon has already collected without BIPA-compliant consent, including the use of such voiceprints and biometric information to operate, deploy, or improve Amazon's commercial voice synthesis and voice cloning products;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data used to develop, train, fine-tune, evaluate, or operate Amazon's voice synthesis and voice cloning models, including without limitation the Voice Products and the Foundational Voice Models;

(4)     Develop and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training audio, in compliance with 740 ILCS 14/15(a);

(5)     Destroy all voiceprints and biometric information of Plaintiffs and Class members that Amazon obtained without BIPA-compliant consent, including all copies, derivatives, and intermediate representations of such voiceprints and biometric information across Amazon's training datasets, Foundational Voice Model parameters, inference pipelines, cross-affiliate data stores, subprocessor systems, and integration-partner deployments;

(6)     Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the Foundational Voice Models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Amazon Polly (Standard, Neural, Long-form, and Generative engines), Amazon Polly Brand Voice, Amazon Nova Sonic, Amazon Nova 2 Sonic, BASE TTS, Audible AI narration voices, ACX narrator voice replica base models, Kindle Direct Publishing Virtual Voice, Alexa text-to-speech, Alexa+, and any iterative, successor, or derivative models trained from those models or derived from voiceprints encoded in them; and with respect to copies of any such model parameters disseminated to Amazon's affiliated entities (including Audible, ACX, AWS, Amazon Music, and IVONA), to Amazon's cloud-infrastructure subprocessors and vendors, and to Amazon's named Nova 2 Sonic integration partners (including Vonage, Twilio,

94

AudioCodes, LiveKit, and Pipecat), take all reasonable measures to recall, remove, and cease further support of the disseminated parameters, and cease further dissemination to third parties of any voice synthesis or voice cloning model parameters that encode unlawfully obtained voiceprints or biometric information;

(7) Certify under oath the destruction and remediation required by subparagraphs (5) and (6), with sufficient detail to permit the Court and Plaintiffs to verify compliance, including identification of the categories of data and model parameters destroyed, the systems and storage locations from which the data and parameters were removed, the third parties to whom recall and takedown requests were directed, and the responses received from those third parties; and

(8) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent in violation of 765 ILCS 1075/30(a); cease the knowing distribution, transmission, or making available to the general public of sound recordings or audiovisual works containing unauthorized digital replicas within the meaning of the Illinois Right of Publicity Act as amended by Public Act 103-836 (effective January 1, 2025); cease materially contributing to, inducing, or facilitating such distribution through the Voice Products; and provide adequate consumer-facing disclosure that voice outputs generated by Amazon's commercial voice products are AI-generated, are derived from voice synthesis or voice cloning models built using voice recordings of unidentified speakers, and have not been

95

authorized by the individuals whose vocal characteristics are reproduced — addressing the deceptive trade practices prohibited by 815 ILCS 510/2(a)(2) and 510/2(a)(3) and the unfair and deceptive practices prohibited by 815 ILCS 505/2.

B.      *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C.      *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of Amazon's unauthorized commercial use of their identities and voices under 765 ILCS 1075/30(a) and Amazon's distribution of and material contribution to the distribution of unauthorized digital replicas under the Illinois Right of Publicity Act as amended by Public Act 103-836; the profits Amazon earned from that unauthorized use to the extent not taken into account in computing actual damages; the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are below that amount; and punitive damages.

D.      *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of Amazon's unfair and deceptive practices, and punitive damages under 815 ILCS 505/10a.

96

E.      *Restitution and Disgorgement.* Order restitution of the benefits Amazon has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints and identities, and disgorgement of the profits Amazon has earned through the integrated commercial chain alleged at ¶¶ 71-73. Plaintiffs request an accounting of all such revenues and benefits.

F.      *Non-Duplication.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G.      *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H.      *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Amazon.com, Inc. on all Counts on which Defendant is found liable.

I.      *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55

(IRPA), 815 ILCS 505/10a (ICFA), 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and any other applicable fee-shifting provision.

J.    *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K.    *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 12, 2026                    LOEVY & LOEVY

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Philip Rogers, Carol Marin, Robin Amer, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*